**ISC—BUNKER RAMO CORPORATION, Plaintiff,**

v.

**ALTECH, INC., Defendant.**

**No. 89 C 8736.**

United States District Court, N.D. Illinois, E.D.

June 25, 1990.

Bruce S. Sperling, Eugene J. Frett, Mitchell H. Macknin, Sperling, Slater & Spitz, Chicago, Ill., Steven G. Lisa, Lisa & Lisa, Phoenix, Ariz., Barry W. Sufrin, John T. Gabrielides, Hosier & Sufrin, Ltd., Chicago, Ill., for plaintiff.

Thomas E. Dorn, Edward M. Keating, Vangelis Economou, Kinzer Plyer Dorn McEachran & Jambor, Chicago, Ill., Mary Ann Weems, Sestric, Korum & Weems, Clayton, Mo., Robert J. Crawford, Ronald B. Coolley, Arnold, White & Durkee, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff ISC–Bunker Ramo Corporation ("ISC") designs and sells computer systems for use in financial institutions, and has its principal place of business in the state of Washington. Defendant Altech, Inc. ("Altech") services computer equipment and purchases and sells used computer equipment. Its principal place of business is located in St. Louis, Missouri. Before the court are Altech's objections to the report and recommendation of Magistrate Balog recommending the issuance of a preliminary injunction prohibiting Altech from infringing on several of ISC's copyrights, misappropriating certain trade secrets, and interfering with certain employment agreements. Magistrate Balog made his ruling after holding a hearing on May 2, 3, and 4, 1990. For the following reasons, we adopt the magistrate's report and recommendation, and issue the injunction as proposed.

Altech objects to virtually every finding in fact and conclusion of law in the magistrate's report. The purported basis for the vast majority of its objections is that the magistrate's findings are "unsupported by the evidence." We have considered all of Altech's objections and find all to be without merit. Most significantly, all of the magistrate's conclusions find support in the record; many are supported by overwhelming evidence. The magistrate clearly based his report and recommendation on careful consideration of all the evidence in the record and, while we specifically address most of Altech's objections, we will not comment on each and every one.

Altech's initial contention is that certain depositions of its employees were not offered into evidence and are not part of the record. The magistrate's report clearly refutes this contention, and in fact both sides referred to deposition testimony in their pre-hearing memoranda. Rep. 2;[1] ISC Pre–Hearing Memorandum at 5, 6, 7, 10, 14, 20; Altech Pre–Hearing Memorandum at 2, 3, 8. Altech has not demonstrated why these depositions should not be considered, though so much evidence supports the magistrate's findings that it scarcely matters whether we consider them or not.

Altech's first objection concerns copyright infringement and trade secret misappropriation relating to ISC's computer programs. Altech contends that ISC is not entitled to protection of these programs under the "first sale" doctrine, which provides that the owner of a copy of copyrighted material can sell the copy without permission of the copyright owner. 17 U.S.C. § 109. Altech contends that the "first sale" doctrine applies here because ISC sold disks containing its copyrighted programs to its customers and these customers in turn sold the copies to Altech. The evidence demonstrated, however, that ISC did not sell copies of its software to its customers; it only licensed them, making the "first sale" doctrine inapplicable. PX 109; Tr. 558–60. Altech contends that, while the software was licensed, ISC sold hard drives containing the programs to its customers. Before Altech could use an ISC program contained on a hard drive, however, it would have to copy the program on to a floppy disk. *See* Deposition of Gary Beyer at 114, 117–20. Sale of these hard drives thus did not constitute a sale of a copy of the copyrighted program.

With respect to Altech's infringement of ISC's field service manuals, Altech contends that ISC failed to prove that the information contained in the manual found in Altech's possession was substantially similar to the works protected by ISC's copyrights. In fact, the evidence conclusively demonstrated that Altech's manual was directly copied from ISC's manuals. PX 5, 5a, 5c, 5e, 20; Tr. 86–90. Altech objects to the findings on copyright infringement of ISC's disks, also on the grounds that there is no evidence that Altech's disks were substantially similar to ISC's. ISC presented detailed testimony demonstrating that Altech's disks were directly copied from ISC's disks. Tr. 248–265.

Altech further objects to the copyright infringement findings on the grounds that certain of the infringed programs were not copyrighted. *See* 17 U.S.C. § 411. The evidence showed, however, that these copies of non-registered programs also infringed on the prior copyrighted works from which they were derived. *See* Tr. 265. Altech also contends that the magistrate erred in taking the fact that Altech's disks contained errors as evidence that it improperly copied the disks. Rep. 26–27. We agree with the magistrate that Altech's possession of multiple copies of a defective disk suggests that the copies were made by Altech rather than by a customer of ISC's, as a customer would have access to a mistake-free copy of the disk. *Id.* In any event, whether Altech actually made copies of the copyrighted disks or not, it improperly used them. The disks were merely licensed to ISC's customers, so at the very least Altech would be liable as a contributory infringer. *See American Int'l Pictures, Inc. v. Foreman,* 576 F.2d 661, 664 (5th Cir.1978).

Altech objects to several aspects of the magistrate's findings on Altech's misappropriation of trade secrets and interference with the contractual relations between ISC and its employees. First, Altech argues that ISC did not present any evidence that any employee or former employees had access to trade secrets. In fact, there was a substantial body of evidence on this point. PX 92, 93; Affidavit of David Hardy, ¶¶ 11–15; Tr. 148–159. Second, Altech argues that the non-disclosure clause of the ISC employee agreement is so broad that it

---

**1.** Items in the record will be referred to using the following abbreviations: Magistrate's Report and Recommendation—Rep. ___; Plain- tiff's Preliminary Injunction Hearing Exhibits— PX ___; Hearing Transcript—Tr. ___.

makes the entire agreement unenforceable. Altech bases this argument exclusively on Illinois case law, despite the fact that the agreements specifically provide that they are to be interpreted under Washington law. Exhibit B to Altech's Objections to Magistrate's Report. Altech has not informed us why we should ignore the parties' selection of Washington law, which was reasonable given the fact that ISC's headquarters is located in Washington. *See Sarnoff v. American Home Products Corp.,* 798 F.2d 1075 (7th Cir.1986). Even under Illinois law, though, we find that the employment agreements are enforceable. Altech argues that the agreements are unlimited as to time and geographical territory. The agreements in fact do contain what amounts to a reasonable time limitation because the disclosure is only prohibited while the information remains confidential. The absence of a geographical limitation is reasonable because ISC is a nationwide corporation.

Third, Altech objects to the magistrate's findings on interference with contractual relations because it contends that ISC has not shown that failure to issue an injunction will result in irreparable harm. To the contrary, ISC has demonstrated that Altech has hired former ISC employees with confidential information and, taking advantage of its lack of training costs, plans to expand into the Chicago area to compete with ISC. Estimating ISC's loss of business from the threatened expansion would involve speculation, so that ISC's injury cannot be adequately compensated with money damages. While Altech contends that ISC's alleged unreasonable delay in bringing suit negates a finding of irreparable harm, this suit was not unreasonably delayed. ISC filed suit in November of 1989 and moved for a preliminary injunction on April 17, 1990. Sixteen of Altech's employees were hired after the fall of 1989.

Altech argues that most of the items which the magistrate found were trade secrets were actually matters of general knowledge. In support of this contention Altech invites us to review "the testimony of all witnesses presented." We decline this invitation, as a great deal of relevant evidence demonstrates that ISC's software and technical information are entitled to trade secret protection. Affidavit of Marc Lewis at ¶¶ 2–10, 14–16; Affidavit of Joseph Taylor at ¶¶ 7–9; Hardy Affidavit at ¶ 6; Affidavit of Scott Schmidtman at ¶¶ 2–7.

 Altech also objects to the magistrate's trade secret findings on the grounds that no contractual relationship existed between itself and ISC, but presents no case law in support of this proposition. Similarly, while Altech contends that the injunction must be limited to the state of Illinois, the case law is to the contrary. *See Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323 (N.D.Ill.1981). The magistrate's findings were amply supported by the evidence, and his proposed order is necessary to protect ISC from irreparable harm. We therefore adopt the magistrate's report and recommendation, which is attached to this opinion. We also will issue the magistrate's proposed order.

## REPORT AND RECOMMENDATION

JAMES T. BALOG, United States Magistrate Judge.

This matter was referred to the undersigned Magistrate to hear the plaintiff's ISC–Bunker Ramo Corporation ("ISC") motion for preliminary injunction and thereafter to submit a report and recommendation. A hearing was held on May 2, 3, and 4, 1990.

The evidence consists of (i) exhibits specifically admitted into evidence; and (ii) oral testimony at the hearing, from Joe Taylor, Marc Lewis, David Hardy and Scott Schmidtman, who were called by ISC, and James Ulsenheimer and Terry Weatherby, who were called by the respondent, Altech, Inc. ("Altech").

The record also consists of 22 affidavits and accompanying exhibits. ISC presented four affidavits prior to the hearing (a portion of the affidavit of Scott Schmidtman was struck), and then called each of those four affiants as live witnesses, and each

was then subject to cross-examination by Altech.

Altech submitted eighteen affidavits. Of those affiants, Altech called only one to give live testimony, Mr. Ulsenheimer. The only other live witness called by Altech was Mr. Weatherby (from whom no affidavit had been previously submitted).

Finally, the record consists of the depositions of Altech's owners and senior management, Gary Fries, Gary Beyer, and William H. Simpson. Messrs. Fries and Beyer were at the hearing, identified by Altech as possible witnesses, but were not called to testify.

I now submit the following:

## I. PROPOSED FINDINGS OF FACT

### A.

### JURISDICTIONAL FINDINGS

1. ISC is a Washington corporation, headquartered in Spokane, Washington. It does business with customers located throughout the United States and in foreign countries. It has several regional offices, one of which is located in Oak Brook, Illinois. ISC has many present and potential future customers located in the Northern District of Illinois.

2. Altech is a Missouri corporation with its principal place of business in St. Louis, Missouri. Altech is doing business in various areas throughout the United States, including Illinois. Starting in or about September, 1989, Altech appointed Jim Ulsenheimer as its sales manager for the Chicago area, and began actively soliciting business in this District. By the time of the hearing, on May 2, 1990, Altech had made 14 written proposals to financial institutions in the Chicago area, and had already begun servicing one of those institutions on a trial basis, namely the Enterprise Savings Bank on Wacker Drive, in Chicago. In addition, Altech services several financial institutions in other cities in Illinois.

### B.

### BACKGROUND FACTS ABOUT ISC'S BUSINESS

3. ISC produces complex computer systems specifically intended for financial institutions such as banks and savings and loans. ISC designs, manufactures, installs, updates, maintains and services these systems.[1]

4. ISC's computer systems are designed to enable financial institutions and their employees to perform many banking transactions efficiently, such as making journal entries, cashing checks, recording deposits, or generating loan documents.

5. ISC competes with such computer industry giants as IBM, NCR, and UNISYS and consequently, ISC invests a substantial amount of money not only on the original design of its systems, but also on the continual update, refinement and improvement of those systems. In this manner, ISC seeks to make its systems the most efficient, the most reliable, and, thus, the most desirable to the financial community.

6. ISC began designing its computer systems in 1977. It was a small company, which by 1979 still had only about 70 employees. ISC designed what is referred to in the industry as a "proprietary architecture" computer system, which means that ISC did not make the design of its computer system available to outsiders so that they could create software to run on the system. While most of the component parts used as the "building blocks" of the ISC computers are generally available on the open market (microprocessors, proms, switches, cabling, and the like), the design of the use and interrelationships of the components is original to ISC and kept confidential.

7. (a) ISC also creates original computer programs to operate its computer systems. Such programs, which consist of instructions to the computer telling it what to do, are generally referred to as "software." The instructions are written in different

---

1. ISC's computer systems consist of a combination of central processing units ("CPU"), or Branch Concentrators "BC"), work stations pro- cessors, peripheral devices such as keyboards, printers, and video screens, and computer programs.

types of computer language. The most basic language is referred to as "object code," which the computer can read, but which is virtually unintelligible to people.

(b) People, in contrast, generally write programs in "source code," which is a language comprised of words and symbols that resemble English. A device exists (with its own conversion "program") which automatically converts "source code," that people can work with, to "object code," that a computer can read.

8. Since its inception, ISC has been heavily dependent on the creative efforts and technical advancements of its engineers. As the company's employment force grew over the years to between 1,000 and 2,000 employees, it hired and trained hundreds of engineers. These engineers were employed in essentially three separate groups. One group designs and develops the "hardware," which comprises the computer system. Another group designs and develops the software. And still another group is devoted to product support; it develops the service manuals, diagnostic software, and training programs so that ISC's systems can be effectively and efficiently installed, maintained, repaired, and improved.

### C.

### THE EVOLUTION OF ISC'S COMPUTER SYSTEMS

9. Over the past twelve years, ISC has developed five basic computer systems. One of ISC's earliest systems was called the "8–Window" system. It allowed eight bank tellers to each have a video screen and input keyboard. All of the data going to and from each teller was processed by one central data processing device, referred to as a "CPU" (i.e. "central processing unit").

10. ISC's engineers next developed a system that could service more than eight tellers at a time. It is called "Pinnacle." Instead of one central processing unit, which could only handle "eight windows," the engineers built data processing capabil-

ity into each teller's machine. Now the system was no longer limited by the capacity of a single "central" processing unit. The system could service many more tellers, whose terminals performed their own data processing. Instead of a CPU, the Pinnacle system used a central "branch concentrator" which, in effect, "concentrated" the data that was being processed at each teller terminal.

11. ISC's first Pinnacle system, which included ISC's first branch concentrator ("BCI") and first workstation ("WPI"), was then improved and expanded by ISC's engineers. The next generation of the Pinnacle system consisted of a re-designed branch concentrator ("BCII"), and re-designed teller "workstations," called "WPII/SWP," "WPIII," and "WPIV."

12. Thereafter, ISC developed another variant of its Pinnacle computer system, which it called "PSP," for "Pinnacle Shared Processor." This newly designed "processor" allowed ISC customers who had the original "8–Window" system to expand those systems by marrying them to the newer "Pinnacle" systems.

13. Finally, in or about early 1988, ISC introduced its newest computer system called "Pinnacle Plus." It has a newly designed branch concentrator, referred to as "BCIII," and a new teller "workstation," referred to as "WPV." The evolution of ISC's computer systems during the twelve years from 1978 to 1990 is shown on PX 98.[2]

### D.

### THE DEVELOPMENT OF ISC'S SOFTWARE

14. The development of new "hardware" systems requires the development of "software." As the hardware design changes, new programs must be written, or existing programs modified, in order to accommodate (or take advantage of) the hardware developments. Also, developments in software design allow new hardware to be

---

**2.** ISC's exhibits are referred to as "PX___."

designed to take advantage of the additional software capability.

15. Consequently, as ISC developed each new computer system, it had to develop new "software" to operate those systems. Moreover, ISC had to develop various kinds of software for each system. Software is commonly developed to be used in layers. The basic "layer" is referred to as the "operating system." This tells the computer how to perform basic functions necessary to achieve the end results that the customer needs. Additional programs are then written, to be used "on top of" the operating system, which tells the computer how to perform the finished tasks that a customer desires, whether it be the recording of journal entries, the preparation of a spread-sheet, or the creation of loan documents. These specific programs are called "application" software.

16. Initially, for its "8–Window" computer system, ISC developed an operating system, and also developed customer application programs to run with it. The "8–Window" system needed only one such "operating" system because it had only one central processing unit. But the Pinnacle system needed several operating systems, because each different computing device capable of processing information required its own unique operating system. Thus, for example, as part of its Pinnacle system, ISC had to develop separate operating systems and accompanying application programs for the BCI branch concentrator, the BCII branch concentrator, the BCIII branch concentrator, and for each of the workstations, i.e., WPI, WPII/SWP, WPIII, WPIV, and WPV.

17. (a) ISC also developed a completely separate category of software for its computer systems, referred to as "diagnostic" and "development" software. These programs do not instruct the computer on how to process information for the customer's use. That is the function of the operating systems and customer application programs previously discussed.

(b) Rather, ISC developed a completely separate group of programs which instruct the computer on how to locate, diagnose, and even correct malfunctions. And again, this software is developed to work in layers. There is an underlying "operating system" used for these special diagnostic and development purposes, which is known as "IDOS" (i.e., "ISC Development Operating System"). In addition, ISC's engineers developed a group of diagnostic utility programs to run on top of IDOS, which include such programs as "WINUTIL," "WINGEN," "WINMAP," and "WINCHESTER UTILITY," "VE," "EL UTILITY 180," "UT–VERSION 175D." (See, PX103)

(c) As ISC's computer hardware has evolved, the diagnostic software (like the "application" programs and operating systems) has also had to be modified and re-designed.

## E.

## THE DEVELOPMENT OF ISC'S SERVICE MANUALS AND TECHNICAL BULLETINS

18. In addition to hardware and software, ISC's "product support" group has had to develop the tools and expertise necessary to support the installation, repair, maintenance and improvement of ISC's hardware systems and software. Among other things, they develop all of the service manuals and technical bulletins on how to properly and efficiently install, repair, maintain, and upgrade ISC computer systems. They also develop and implement extensive formal training programs and procedures, in order to teach the conventionally skilled computer service engineer all of the special knowledge, skills and procedures they need in order to work with ISC's systems. In this regard, ISC maintains more than 400 field service engineers ("FSE's") located throughout the country, each of whom has been given up to seven weeks of specialized training on ISC computer systems at ISC's training facility in Spokane, Washington.

19. ISC's support engineers have established specific procedures for isolating problems with ISC equipment, developing solutions for those problems, and disseminating that information to the FSE's. All

problems encountered by the FSE's in the field are monitored. The most frequent are isolated and addressed at the bi-weekly meetings of the Field Failure Review Board. The problems are then assigned-out to the appropriate engineering group to develop a solution, whether it be a re-design of certain hardware, the development of a new repair procedure, the re-design of certain software, or some combination of the above. After a proposed solution is devised, it is sent to a specific field location for testing. If the solution works, it is fully documented and sent to the FSE's by way of a "technical bulletin." These bulletins are then periodically incorporated into the appropriate service manual for the equipment or software in issue.

20. The service manuals for ISC's computer hardware, alone, are voluminous. They would substantially fill the trunk of a FSE's automobile, and are far too voluminous for ready access and use. As a result, starting in 1985, ISC's support engineers created a separate compilation which contains the technical information from all of the service manuals that a FSE would most commonly need in performing installation, repair and maintenance services. This compilation is called the Field Service Pocket Reference Guide sometimes referred to as the "The Guide" or the "Pocket Guide". It has gone through several revisions to accommodate the changes and updates to ISC's computer systems. The most recent version of The Guide (i.e., "Rev. 4, Change B"), was released in January, 1989.

### F.

### ISC'S TRAINING PROGRAMS

21. As previously stated, ISC has a formal training program to teach the special skill and knowledge necessary to effectively install, service, repair and up-grade its computer systems. ISC has an entire book of outlines for the training courses available to its FSE's. The course outlines also state the extent of prior experience and training required as a pre-requisite to ISC's special training programs. In this regard, ISC does not teach basic electronics, or·

repair and maintenance skills. Its FSE's are required to have a basic education in electronics (mostly from technical schools, or the armed services), and some general experience, skill and knowledge in computer repair and maintenance. ISC's courses then teach the special knowledge and skills one must learn in order to effectively and efficiently service, install and maintain ISC's unique systems.

22. ISC's training school issues and uses ISC's field service manuals and The Guide as reference materials for the FSE's. Each course outline details the ISC reference manuals to be used in that training curriculum. The FSE's are given classroom lectures from those manuals, and are then given "laboratory" work where they learn to apply the instructions to ISC's computer systems.

### G.

### ISC'S INVESTMENT IN ITS TECHNOLOGY

23. ISC has made, and continues to make, a significant investment in the development, improvement and updating of its (i) computer systems, (ii) software for customer applications, operating systems and diagnostics, (iii) service manuals and technical bulletins, and (iv) training of FSE's.

24. The development and updating of the IDOS operating system, alone, which is used for diagnostic purposes, has required tens of thousands of hours of engineering time. ISC has invested still more time, effort, and resources in the development of its service manuals, The Guide, and its continuing programs to isolate and solve service and maintenance problems, which are reflected in the update versions of the service manuals and The Guide. ISC has invested substantial additional sums of money in training the more than 400 FSE's that it employs throughout the country. It maintains a separate facility for training, including a staff of instructors and technical writers, and pays the salary, room, board and traveling expenses of the FSE's as they attend school. Each FSE is normally sent to Spokane for specialized train-

ing within weeks of being hired by ISC. And, as new systems are introduced by ISC, its existing FSE's are typically brought back to Spokane for additional training.

### H.

### THE CATEGORIES OF TECHNOLOGY WHICH ARE THE SUBJECT OF THIS LAWSUIT

25. The technology created by ISC which is the subject of this lawsuit, can be summarized as follows:

(a). *Computer Programs (i.e., "Software")*

This category of technology includes the special operating system written for diagnostic and development purposes by ISC, known as IDOS, and the special diagnostic utility programs written by ISC that run "on top of" IDOS. This category of technology also includes certain of the special operating systems that ISC wrote for use in running customer applications.

(b). *Service Manuals, Technical Bulletins, and The Guide*

This category includes the written compilations, and the special technical information contained in them, all of which was developed by ISC for use in installing, servicing, repairing and upgrading its equipment.

(c). *Training Programs and Materials*

This category includes the special skill, knowledge and training provided by ISC to its FSE's. They obtain this special skill and knowledge during ISC's formal train-ing programs, which include the information contained in ISC's service manuals, technical bulletins and The Guide. Thereafter the FSE's use the information taught to them, and continually obtain updated information, which is available from technical bulletins and updated versions of ISC's Guide and service manuals. In addition, technical information and procedures are regularly exchanged among ISC's FSE's and support engineers.

26. ISC protects the technology which it has developed under the federal Copyright Act, and as trade secrets and confidential information under state law. As more fully discussed in the "Conclusions of Law" section below, these laws protect innovating companies from misappropriation and unauthorized use and disclosure of their technological advancements, so that they can recover, and thus economically justify, the investments required to generate the technology in the first instance.

### I.

### PROTECTION UNDER THE FEDERAL COPYRIGHT ACT

27. Each of the computer programs identified below is an original work (or a derivative of an original work), created by ISC's employees. Each is subject to protection under the federal Copyright Act, 17 U.S.C. § 101 et seq. ISC has applied for Certificates of Registration from the Registrar of Copyrights for each of the programs. Certificates have been issued for the programs as indicated immediately below, and applications are pending for the others:

(a). IDOS Operating Programs For Diagnostic Use (See, PX102):

| Work | Cert. of Reg. No. | Date Issued |
|---|---|---|
| IDOS V1.2 | TXU–396–031 | 01/03/90 |
| IDOS 937 and 437 | TXU–396–029 | 01/03/90 |
| IDOS 940 and 440 | Application filed 04/23/90 | |
| IDOS 950 and 450 | TXU–396–026 | 01/03/90 |
| IDOS 960 | Application filed 04/23/90 | |
| IDOS 460 | TXU–402–607 | 02/28/90 |

(b). IDOS Utility Programs For Diagnostic Purposes (See, PX103):

| Work | Cert. of Reg. No. | Date Issued |
|---|---|---|
| Makeprom, Trancomp, Tranxref, FTRNMAIN, DESCMAIN, DA | TXU–396–032 | 01/03/90 |
| WINUTIL, WINGEN, WINMAP | TXU–396–030 | 01/03/90 |
| WINCHESTER UTILITY, VE, EL UTILITY 180, VT–VERSION | Separate applications filed 04/23/90 | |

(c). ISC Workstation Operating Systems (See, PX104):

| Work | Cert. of Reg. No. | Date Issued |
|---|---|---|
| Version 401A | Application filed 4/23/90 | |
| Version 405A | TXU–396–028 | 01/03/90 |
| Version 405E | TXU–396–027 | 01/03/90 |
| Version 410A | Application filed 4/23/90 | |

(d). ISC Field Service Pocket Reference Guide ("The Guide") (See, PX100):

| Work | Cert. of Rev. No. | Date Issued |
|---|---|---|
| Original Release of The Guide | TXU–402–612 | 02/28/90 |
| Revision 1, July, 1985 | TXU–402–611 | 02/28/90 |
| Revision 2, November, 1986 | TXU–402–605 | 02/28/90 |
| Revision 3, January, 1987 | TXU–402–610 | 02/28/90 |
| Revision 4, March, 1988 | TXU–402–609 | 02/28/90 |
| Revision 4, Change "A", August, 1988 | TXU–402–608 | 02/28/90 |
| Revision 4, Change "B", January, 1989 | TXU–402–606 | 02/28/90 |

---

## J.

## PROTECTION UNDER THE UNIFORM TRADE SECRETS ACT

(a). *ISC's Guide, Service Manuals, and Technical Bulletins*

■ 28. ISC's Guide (PX20) Service Manuals (PX93(a) through 93(g)), and technical bulletins (PX96) are compilations of valuable technical information and procedures. They have been compiled at great effort and expense by ISC, and are extremely useful tools for its business. As such, and as discussed more fully in the Conclusions of Law, these compilations fall squarely within the definition of a trade secret. *See, e.g.*, Ill.Rev.Stat., ch. 140 ¶ 352(d) (A "trade secret" is "a ... compilation, formula, ... data.").

■ 29. The compilations identified above would constitute trade secrets of ISC even if ISC had not developed virtually all of the technical information and procedures

set forth in them. This is because the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known. But here, ISC also developed virtually all of the technical information and procedures set forth in its compilations. That information and those procedures, independently, constitute ISC trade secrets. Although the volume of this information and procedures is vast, that does not detract from their status as trade secrets; it merely confirms the huge and continual effort by ISC to create the information and procedures in the first instance. The information and procedures are identified in the compilations; and as previously stated, virtually all of it was created by ISC for use in connection with ISC computer systems.

30. ISC has undertaken reasonable efforts to keep its compilations, technical information, and procedures from becoming generally known outside of ISC and those third-parties who by contract (i.e., "license"), custom and usage, or fiduciary duty are obligated not to use or disclose such information without ISC's consent.

31. ISC's efforts to keep secret its service manuals, The Guide, technical information, and procedures include the following:

(a) As a matter of policy and practice, documents which contain trade secrets or other confidential information are marked as "proprietary" to ISC. ISC explains in legends on documents, and in training sessions, that a document marked "proprietary" means:

> All information contained in this publication is confidential and proprietary. The information is the property of ISC Systems Corporation and shall not be duplicated or reproduced in any manner without express written permission. This information is supplied for the sole use of the individual to whom this publication has been issued. Except for its intended purpose relating to the recipient's employment or contract terms with ISC, the information shall not be used or disclosed by the recipient.

*See, e.g.,* PX 20, inside cover; PX 93(a), inside cover.

(b) All employees are required to sign a memorandum of employment, which contains a specific confidentiality provision, as a condition of employment.

(c) Technical compilations and information are not generally available or distributed to all ISC employees. They are distributed and available to employees only on a "need-to-have" basis, in accordance with their job responsibilities.[3] The lists of authorized recipients of specified categories of information are updated and purged, to account for personnel changes. An employee that desires access to a particular category of information, but is not on the required distribution list, must make a special request and demonstrate a job-related need for the information. Management then reviews the request and decides if distribution to the employee is appropriate.

(d) Upon termination of employment, an employee is required by ISC to return all ISC property and proprietary information, and the employee's inventory is checked against company records. The terminated employee is also required to participate in an exit interview with the company.

(e) ISC does not distribute its service manuals or technical bulletins to its customers, except for those customers who are on ISC's self-maintenance program and have confidentiality agreements with ISC. The Guide is never given to a customer. Thus, as a general practice, ISC does not distribute these manuals or bulletins with its computer systems. The customers receive only "user guides," which tell them how to use the equipment. They do not receive the extensive manuals and information on how to install, maintain, repair, and upgrade the systems.

---

**3.** For example, a technical bulletin containing a hardware design change for an existing ISC computer system would normally have the following distribution: Sales Dept.—No; Human Resources Dept.—No; Finance Dept.—No; Manufacturing Dept.—No; Marketing Dept.— No; Engineering Dept.—No (except perhaps one engineer); Information Services Dept.—No; Training Dept.—yes; Field Service Dept.—yes; Technical Publication Dept.—yes; Product Support Dept.—yes; Software Engineering Dept.— No.

(f) Any customer desiring access to technical information beyond the "user" level must make a special request and demonstrate a particular need for the information. Such customer requests are infrequent. Those that do come in are reviewed by management, which decides whether distribution of the requested technical information is appropriate. If the request is approved, the customer must agree to preserve the confidentiality of the information. As a matter of company policy, schematics are not provided to customers. To the extent FSE's must work with a customer to solve a specific problem, the customer is given access only to that information necessary to address its specific problem.

(g) Customers, such as those on ISC's self-maintenance program, who desire to receive training from ISC, must sign a non-disclosure agreement before attending classes or receiving training materials.

(b). *ISC's Computer Software Are Trade Secrets*

█ 32. The computer programs which ISC has created also are protectable as trade secrets, and fall squarely within the statutory definition. *See e.g.*, Ill.Rev.Stat. ch. 140 ¶ 352(d) (a "trade secret" is "a ... program").

33. ISC has similarly taken reasonable efforts to maintain the secrecy of the design and logic of its computer programs. ISC's computer programs are only distributed in object code, which is not intelligible to human beings. The source code for ISC's IDOS programs, and its workstation and branch concentrator operating systems, is tightly controlled. Access to IDOS source code is limited to a select number of employees in ISC's Spokane, Washington headquarters. The IDOS source code is not sent to ISC employees in the field, nor is it provided to third-parties. Source code for ISC's other operating systems is also maintained in ISC's Spokane headquarters, and access is similarly restricted.

34. Consistent with the common practice in the computer industry respecting commercial systems, ISC provides its computer programs to customers only by way of a license agreement. ISC does not sell its computer programs to anyone. The license agreements provide that ISC owns the programs, and the customer agrees not to make any copies (except for back-up purposes), and not to re-distribute the programs to anyone. The customer further agrees that the information contained in the program is confidential, and will not be disclosed without ISC's prior written consent.

(c). *ISC's Efforts To Maintain Secrecy Have Been Successful*

35. (a) ISC's efforts to maintain the secrecy of its service manual, The Guide, the technical information and procedures contained therein, and its computer programs, have not only been reasonable, as previously stated; they have been successful.

(b) The evidence shows, on a "big-picture" basis, that ISC has more than 2,500 customers, many of whom have multiple locations. ISC has more than 1,000 employees; and it has hundreds of FSE's and support personnel. Nonetheless, as the evidence also shows, ISC's secrecy measures have been sufficient to cause the industry to acknowledge that ISC's computer systems and its software are "proprietary."

(c) Other than from ISC's proprietary publications and software, there are no readily available sources for the information, technology, and procedures contained within ISC's service manuals, The Guide, or ISC's software.

36. (a) Altech's own conduct confirms that ISC's procedures have been successful. Altech admits that it does not have any service manuals for ISC's computer systems except for The Guide. As to The Guide, Altech admits that it "found" only one copy—a subject addressed further below—and then made copies of that one Guide for each of Altech's field service engineers. The copy that Altech concedes it had, contained "proprietary" notices, which Altech unsuccessfully attempted to obliterate in the process of copying and redistributing it to Altech's employees.

(b) Similarly, the information in ISC's computer programs, including their logic and design, are not generally known. Altech concedes that it does not know that information, and does not create its own programs. Rather, as discussed further below, Altech unlawfully obtains, copies, and distributes ISC's programs to its employees.

(c) Altech also hires ex-ISC employees, who have been extensively trained by ISC. Currently, it has 22 of them. In this manner, Altech has available to it, and to all of its field service engineers, the most current ISC technology, relating to the most current ISC computer systems. In contrast, Altech has only a few field service technicians who work on ISC equipment and are not ex-ISC employees.

37. Although Altech attempted at the hearing to find and focus upon "leaks" in ISC's security procedures, so as to demonstrate that they were not "reasonable," the evidence was to the contrary. ISC's technology remains generally perceived in the industry as "proprietary," and Altech had to obtain and disseminate that information in an unauthorized fashion. Moreover, even the leaks that Altech attempted to find, were largely rejected by the evidence. For example:

(a) One of Altech's current employees submitted an affidavit stating that he had worked at a certain bank that was a "self-maintainer" of ISC equipment, and that ISC had trained the bank employees without ever obtaining "non-disclosure" agreements from the bank or its employees. ISC then refuted these assertions by introducing non-disclosure agreements executed by the bank and its employees, including the affiant.

(b) Altech submitted form affidavits from seven prior ISC customers, stating in vague and conclusory fashion that ISC "sold" its software to them, and that they were free to re-sell the software (without ever stating that they did so). ISC then refuted these assertions by introducing the transaction documents with each such customer (which Altech's affiants never addressed). In each instance, the documents stated that the software was licensed, not sold; remained the property of ISC; and the customer agreed that the software would not be disseminated or disclosed to others without ISC's prior written consent. Consequently, I have determined to put no weight on Altech's seven "Form Affidavits."

## K.

### PROTECTION AGAINST ALTECH'S INTERFERENCE WITH ISC'S EMPLOYMENT AGREEMENTS

38. ISC, as previously stated, enters into employment agreements with each of its employees who it trains, or who otherwise might have access to ISC's trade secrets or confidential information.

39. ISC's employment agreements do not preclude an ex-employee from "competing" against ISC after termination. The only post-termination constraints relate to the use or disclosure of ISC's confidential information. The ex-employee is precluded from using or disclosing ISC's confidential information only so long as it is otherwise maintained as confidential. This prevents the ex-employee from destroying the confidentiality of ISC's technology, but is no more restrictive on him than the rest of the public, which remains generally unaware of the information.

40. Likewise, the ex-employees are precluded from taking only those competitive positions that would inherently call upon them to use technology of ISC that remained confidential. In all other respects, ISC's employees are free to immediately take any job in the computer industry (and can, for example, immediately begin servicing other brands of computer equipment, including equipment used by banks and other financial institutions).

## L.

### ALTECH'S BUSINESS AND ACTIVITIES

41. Defendant, Altech, is a Missouri corporation, with its principal place of business in St. Louis, Mo.

42. Altech is in the business of servicing computer systems manufactured by ISC and others. It maintains a staff of field service engineers located in various areas throughout the country, and services equipment on a nationwide basis.

43. Approximately 15 to 20% of Altech's business relates to the servicing of ISC computer equipment.[4]

44. Altech is currently engaged in an extensive effort to obtain new business in the Chicago area for servicing ISC computer systems. It has made at least fourteen written proposals to major financial institutions located in the Chicago area. One has been tentatively accepted, and Altech is providing service there on a trial basis. The other proposals are outstanding. Altech has recently hired a field service engineer who resides in the Chicago area to service its new customer. That service engineer is also an ex-ISC employee who was specially trained by ISC.

45. Altech widely proclaims its ability to provide the most complete, up-to-date and efficient service and maintenance for all of ISC's computer systems, at prices substantially less than ISC's.

46. Altech offers its "up-to-date" and "complete" service for ISC systems without maintaining any staff or facilities for writing, developing and updating computer operating and diagnostic software; or for researching, developing and updating field service manuals and bulletins; and Altech has no training materials, and virtually no program for training its service technicians in the service and repair of ISC systems.

47. Instead, Altech appropriates the necessary special technology, manuals, programs, and training from ISC (at no expense to itself), as more specifically discussed below.

## M.

### ALTECH COPIED ISC'S GUIDE

48. The only service manual that Altech purported to ever have for ISC equipment is The Guide. Mr. Fries of Altech admitted making copies of that manual, and providing them to each of Altech's field service engineers. Mr. Fries repeatedly testified in his deposition that he never realized The Guide had been created by ISC, or was "proprietary" to ISC, or was copyrighted by ISC. It is difficult to believe that a single copy of The Guide was found among "used equipment," as Fries testified at his deposition, and that this "found" copy happened to have no front page (where ISC's name is printed), no inside page (where ISC's proprietary legend and copyright notice is printed), and "blank" sections on the very bottom of each of more than 300 pages (where ISC also printed the word "proprietary" and the page number).

49. In addition, Mr. Fries provided a copy of The Guide to more than eighteen ex-ISC employees, each of whom had one at ISC. Many of them would have just turned their Guides back in upon leaving ISC, only to immediately receive another (without cover pages, etc.) from Mr. Fries. Under these circumstances, it is even more difficult to believe Mr. Fries' deposition testimony that he did not know (and no one told him) that he was making and handing out copies of ISC's Guide.

50. Still further, the various copies of The Guide obtained from Altech demonstrated, contrary to Mr. Fries' testimony, that Altech had a complete version of the ISC Guide, replete with "proprietary" notices which Altech attempted to obliterate. Some of Altech's copies still had the word "proprietary" on certain pages. On one copy, the use of "white-out" could be physically observed; moreover, it only partially obliterated the word "proprietary." And two copies obtained from Altech contained handwritten page numbers on the otherwise "blocked-out" bottom of each page. These handwritten numbers correspond exactly to, and had to be copied from, the

---

**4.** The percentage of Altech's business relating to servicing ISC equipment is apparently much higher in certain areas. James Ulsenheimer, an Altech Sales Manager, testified that in his territory, which includes Illinois and Ohio, the servicing of ISC equipment may account for as much as 90% of Altech's business.

printed page numbers on an unaltered version of ISC's Guide.

### N.

### ALTECH COPIED AND OTHERWISE UNLAWFULLY OBTAINED ISC SOFTWARE

51. Altech also unlawfully obtained and used ISC's diagnostic software. It has never written or developed its own. It made unauthorized copies of ISC's IDOS disks, and provided a copy (together with a copy of ISC's Guide) to its field service engineers.

52. Altech contends that it did not "copy" the IDOS disks, but rather obtained all the IDOS disks it needed from "used" ISC computer equipment that it purchased or brokered. The contention is both irrelevant and not credible. The IDOS disks found in the possession of its field service engineers were not in the form distributed by ISC. Disks become unique through usage in the field. Altech's collection of IDOS disks fell into distinct groups of multiple identical copies of several unique disks. This indicated that multiple copies had been made long after the disks left ISC's library. Also, one of the disks, for which Altech had multiple copies, contained an error. Only a company in the position of Altech, who did not have ready access to another IDOS disk, would likely proliferate that error by making copies of a defective disk.

(a) IDOS Group 2 which consisted of 4 disks (PX107) had the "mistake file" missing from each copies disk, so it is apparent that only an ISC trained person could use these IDOS disks in a meaningful way.

53. Also, Altech's own testimony rejected its counsel's argument. While counsel argued, orally and in briefs, that IDOS floppy disks were abundantly available in used equipment purchased or brokered by Altech, the principles of Altech, Mr. Fries and Mr. Beyer, testified at their depositions that IDOS disks were in "great demand," were "rare," and were "in short supply." Consequently, it does not appear likely, for example, that Altech would have found seven identical copies of a unique IDOS disk in used equipment; it appears much more likely that a single IDOS disk, being "rare" and "in great demand," would be obtained by Altech, and copied and distributed to its field service engineers. Significantly, Altech produced no IDOS disks other than the ones it provided to its field service engineers, and a single extra disk kept at its main repair facility. These facts do not support counsel's assertion that IDOS disks could be found everywhere in used ISC equipment. Mr. Fries and Mr. Beyer were present at the hearing, identified as possible witnesses, but were not called to refute their deposition testimony that IDOS disks were rare.

54. In addition, Altech knew, or at least should have known, that whatever IDOS disks or other ISC software it found in used equipment was being re-distributed in violation of ISC's license agreements. As Mr. Weatherby of Altech admitted, based on his extensive personal experience in the computer business, software for commercial computer installations is almost always licensed. ISC's software, to Mr. Weatherby's knowledge, has always been licensed. The customers who had ISC computer systems did not own the software, and had no right under their licenses to re-distribute it to anyone. Apart from industry practice, and Mr. Weatherby's knowledge, Altech had ready access to many transaction documents whereby ISC licensed its software to its customers. Altech's current customers would have had transaction documents with ISC that contained those same standard license provisions.

55. (a) A service and repair business, such as Altech's, also needs computer operating systems to "hot stage" (i.e., test in actual operation) repaired or reconditioned electronic boards, replacement parts, or system components.

(b) Altech has never developed any of its own software for these purposes. Again, it obtains and uses ISC's copyrighted operating programs, in violation of ISC's license agreements and copyrights, to do its hot staging.

## O.

### ALTECH INTERFERES WITH ISC'S EMPLOYMENT AGREEMENTS

56. Finally, Altech has virtually no program or facility for training the conventionally skilled computer technician in the special skills and knowledge necessary to efficiently update, modify, service, and repair ISC computer systems. Instead, Altech hires technicians whom ISC has put through its extensive training programs, and—in direct violation of their employment agreements—uses these former ISC employees to service ISC computer systems, and to transfer ISC's most recent technical information, techniques, knowhow, and confidential information to Altech's other technicians.

57. In total, Altech has hired at least 22 ex-ISC employees, all of whom have been specially trained by ISC. Eighteen of those ex-ISC personnel have been hired by Altech since February, 1989.

58. The importance of the special knowledge and skills taught by ISC during its training programs was confirmed by the testimony of Altech's Sales Manager, Mr. Ulsenheimer. He, too, is an ex-ISC employee. He left ISC in 1985 to join a bank and to run a self-maintenance program for the bank's ISC computer system. Mr. Ulsenheimer had been trained while at ISC on all ISC systems that existed prior to his departure. By the time Ulsenheimer left ISC, he also had four years' experience working on ISC systems, and gained two more years' experience while working at the bank on ISC equipment. Then, in late 1987, the bank acquired ISC's updated computer system, the "Pinnacle Plus," which had newly designed branch concentrators and workstations. Notwithstanding his extensive prior training and experience, Mr. Ulsenheimer needed and requested additional special training from ISC on this new system, for himself and his staff. ISC then sent a technical instructor to the bank for four days to provide the training, together with service manuals and video tapes. For this training, ISC charged and the bank paid $10,000.00.

59. The technical information and procedures created by ISC, compiled in its service manuals and The Guide, and taught in ISC's training programs, represent special knowledge and skill, not readily ascertainable by computer repair and service technicians with conventional skills and experience. This is confirmed by (i) the specialized nature of the information itself, (ii) the fact that ISC spends so much time and effort developing the information, (iii) the fact that ISC spends so much time and effort teaching the information to ordinarily skilled and educated computer technicians, (iv) the fact that the information is not readily available or ascertainable from any source other than ISC's service manuals and training programs, (v) the fact that a service organization such as Altech hires so many ISC trained technicians, and equips them with ISC's Guide and diagnostic software, (vi) the fact that a very experienced service engineer like Mr. Ulsenheimer must obtain additional training and manuals when ISC develops an updated computer system, and (vii) the fact that ISC's computer systems are generally recognized, as Altech concedes, to be "proprietary."

60. Altech has hired the ex-ISC employees identified below. Each received substantial specialized training at ISC, had access to ISC's confidential service manuals, software and technology, including updates of the same, and gained substantial experience at ISC predicated on that specialized training and those confidential materials. Each also executed a written employment agreement with ISC, pursuant to ISC's standard practice.[5] The ISC ex-employees hired by Altech are (*See,* PX101):

---

5. Although a written contract had not been found for one of the ex-employees by the time of the hearing, it is reasonable to infer that it existed. ISC proved its standard procedure, and produced the other 21 written contracts. Moreover, the ex-employee for whom a written contract had not been located was working for Altech, and Altech did not introduce any evidence which denied that he, too, had executed an agreement pursuant to ISC's standard practice.

| NAME | LAST TITLE HELD[6] | DATE OF HIRE BY ISC | DATE OF TERMINATION OF EMPLOYMENT WITH ISC | DATE STARTED WITH ALTECH |
|---|---|---|---|---|
| Gary Fries | F.S.E.II | 01/11/82 | 05/22/85 | 10/87 |
| Gary Beyer | F.S.E.II | 09/07/82 | 06/21/85 | 10/87 |
| Jon Stetson | F.S.E.II | 03/05/84 | 03/07/86 | 04/88 |
| Bill Simpson | Sr.S.R. | 12/21/81 | 09/16/85 | 09/88 |
| Jim Ulsenheimer | F.S.Mgr. | 10/04/82 | 01/03/86 | 02/89 |
| Paul Pagano | D.S.S. | 11/01/84 | 03/10/89 | 03/89 |
| Roger Dell | F.S.Mgr. | 10/01/79 | 05/12/89 | 09/89 |
| Roy C. Wagonner | C.S.E.III | 08/05/85 | 06/05/89 | 09/89 |
| Joe Rubertone | C.S.E.II | 05/13/85 | 10/06/89 | 10/89 |
| Dave Winter | C.S.E.I | 08/10/87 | 10/16/89 | 10/89 |
| Robert Henley | Sr.S.R. | 07/13/81 | 11/02/89 | 11/89 |
| Paul Pinick | C.S.E.I | 07/07/86 | 11/24/89 | 11/89 |
| Robert Reilly | C.S.E.I | 08/10/87 | 12/08/89 | 12/89 |
| Brian Koppes | C.S.E.I | 03/30/87 | 12/14/89 | 12/89 |
| Ronnie Smith | C.S.E.II | 02/08/82 | 08/11/89 | 12/89 |
| Mark Garney | C.S.E.II | 12/17/84 | 12/26/89 | 12/89 |
| Gregg Walters | Asso.C.S.E. | 05/11/87 | 12/26/89 | 12/89 |
| Todd Krieg | C.S.E.II | 04/14/86 | 01/02/90 | 01/90 |
| Cliff Cline | C.S.E.II | 03/14/88 | 01/03/90 | 01/90 |
| Kathy Harper | C.S.E.II | 04/07/86 | 01/04/90 | 01/90 |
| Dick Pinkerton | C.S.E.II | 07/01/85 | 01/05/90 | 01/90 |
| Clarence Bultema | F.T.S. | 02/04/80 | 01/31/89 | 04/90 |

61. To the extent these findings vary from the testimony of James Ulsenheimer, then I have chosen not to credit his testimony.

## II. PROPOSED CONCLUSIONS OF LAW [7]

### A.

### JURISDICTION AND VENUE

(a). *Subject Matter Jurisdiction*

██ 1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a), and the principles of pendent jurisdiction. The Amended Complaint raises claims arising under the Copyright Act, and also raises pendent claims for trade secret violations and interference with contract, among others. The pendent claims arise from the same nucleus of operative facts as the copyright claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

██ 2. In addition, this Court has subject matter jurisdiction of the trade secret and interference with contract claims pur-

---

6. KEY TO ABBREVIATIONS:
 F.S.E. Field Service Engineer
 C.S.E. Customer Service Engineer
 (formerly known as Field Service Engineer)
 Sr.S.R. Senior Sales Representative
 F.S.Mgr. Field Service Manager
 D.S.S. District Support Specialist
 F.T.S. Field Technical Specialist

7. To the extent any Findings reflect legal conclusions, they are incorporated by reference into the Conclusions; and any Conclusions which reflect findings of fact, are incorporated by reference into the Findings.

suant to 28 U.S.C. § 1338(b) and 28 U.S.C. § 1332(a). The parties to this action are citizens of different states, and the matter in controversy with respect to both the trade secret and the interference claims exceeds the sum or value of $50,000, exclusive of interest and costs.

(b). *Personal Jurisdiction*

■ 3. This Court has jurisdiction over the person of Altech pursuant to Fed.R. Civ.P. 4(e) and Ill.Rev.Stat. ch. 110, ¶ 2–209, which is incorporated therein. Altech (i) is doing business in Illinois, including the Northern District of Illinois; (ii) has transacted business and committed tortious acts in Illinois, including the Northern District of Illinois, from which a substantial portion of the claims herein arose; and (iii) otherwise has sufficient contacts with Illinois, including the Northern District of Illinois, to warrant the exercise of personal jurisdiction over Altech consistent with the requirements of due process.

(c). *Venue*

■ 4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(a), in that Altech is amenable to personal jurisdiction in Illinois, and therefore may be found in Illinois for purposes of the copyright venue statue. *Gallery House, Inc. v. Yi*, 587 F.Supp. 1036 (N.D.Ill.1984); *Mihalek Corporation v. State of Michigan*, 595 F.Supp. 903, 907 (E.D.Mich.1984).

5. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), in that Altech has sufficient contacts with the Northern District of Illinois so as to be subject to personal jurisdiction here, assuming that the District was a separate state; therefore, Altech resides in the Northern District of Illinois for purposes of the general venue statute. *FMC Corporation v. Varonos*, 892 F.2d 1308, 1313 (7th Cir.1990).

### B.

### STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

6. ISC has moved for preliminary injunctive relief, pending trial on the merits, with respect to three of its claims against Altech: copyright infringement, misappropriation of trade secrets, and interference with contract. To obtain a preliminary injunction, ISC must show, as a threshold matter, that it (i) has no adequate remedy at law; (ii) will suffer irreparable harm if the injunction is not granted; and (iii) has a better than negligible chance of succeeding on the merits. *Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989).

■ 7. Assuming ISC can meet this threshold burden, the analysis shifts to a "sliding scale" consisting of (i) the balance of hardships; (ii) the public interest; and (iii) the actual likelihood that ISC will succeed on the merits. *Ibid.* The heavier that the balance of hardships and the public interest weigh in favor of ISC, the less that will be required of ISC with respect to its likelihood of success on the merits. *Ibid.*

### C.

### ISC'S COPYRIGHT CLAIMS

(a). *Irreparable Harm*

■ 8. The evidence shows that ISC has, and will continue to suffer irreparable injury for which it has no adequate remedy at law, unless Altech is preliminarily enjoined from infringing ISC's copyrighted works.

9. Specifically, there is a presumption of irreparable injury in copyright infringement cases, which Altech has wholly failed to rebut. *Atari, Inc. v. North American Phillips Consumer Electronic Corp.*, 672 F.2d 607, 620 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). In addition, ISC has introduced substantial and uncontroverted evidence of the considerable time and money that it has invested in the development of its copyrighted computer programs, The Guide, and its service manuals. Accordingly, even without the presumption, ISC has shown irreparable harm from Altech's wholesale copying and unauthorized use of ISC's copyrighted works. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d

1240, 1254 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

10. The inadequacy of ISC's legal remedy is also demonstrated by the deliberate and systematic manner in which Altech has infringed ISC's copyrights works, and the likelihood that Altech will continue to do so unless preliminarily enjoined by this Court. *Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C.Cir.1990).

(b). *Likelihood Of Success On The Merits*

11. ISC has demonstrated a strong likelihood of success on the merits of its copyright infringement claims against Altech.

(1). Validity

12. ISC introduced copyright registrations (or pending applications) for each of its milestone versions of its IDOS [8] and related utilities, its Pinnacle operating systems, its PSP operating systems, and its Guide. These registrations constitute prima facie proof of the validity of ISC's copyrights in the subject works. *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 247 (S.D.N.Y.1990); 17 U.S.C. § 410(c).

13. In addition, ISC introduced substantial evidence that the subject works were created by and wholly original to ISC. Altech offered nothing to rebut this evidence or the registrations. Accordingly, the Magistrate finds that ISC has valid, registered copyrights in the works as identified in the Findings, ¶ 27, *supra.*

(2). Copying and other infringements

14. The Copyright Act confers the following exclusive rights on the copyright holder: (i) the right to make copies of the work; (ii) the right to prepare derivatives of the work; (iii) the right to distribute the work; and (iv) the right to perform or display the work. 17 U.S.C. § 106.

15. Altech has infringed on two of these exclusive rights with respect to ISC's copyrighted works: ISC's right to make copies of its works, and ISC's right to control distribution of its works.

(i). *copying of ISC's field service guide*

16. ISC introduced substantial evidence that Altech made multiple unauthorized copies of ISC's copyrighted Guide. Based on the striking similarities, indeed absolute identity, of the copies in Altech's possession to ISC's copyrighted work, ISC has proven infringement of its Guide as a matter of law. *Joy Manufacturing Co. v. CGM Valve & Gauge Co., Inc.*, 730 F.Supp. 1387, 1399 (S.D.Tex.1989).

17. In addition, the evidence shows that Altech had knowledge that the Guide was a copyrighted, proprietary work created by ISC, and attempted to obliterate all proprietary notices in order to conceal its unauthorized copying. From this evidence, the Magistrate concludes that Altech's infringement of ISC's Guide was willful.

18. Conversely, the Magistrate finds a complete lack of any credible evidence to support Altech's assertion that its acts of infringement were innocent. Moreover, the assertion is irrelevant because "[e]ven an innocent infringer is liable for infringement. Under [17 U.S.C.] § 501(a) intent or knowledge is not an element of infringement." *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110, 1113 (2nd Cir.1986).

(ii). *copying of ISC's IDOS and related utilities*

19. ISC introduced substantial evidence that Altech made three sets of multiple copies of three unique disks containing ISC's copyrighted IDOS program and related utilities. Each copy within a given set was identical to all other copies in that set, and all such copies in each set were identical to one of the versions of ISC's copyrighted IDOS and related utilities.

20. The Magistrate concludes that Altech's testimony that someone other than Altech made these copies lacks credibility. Instead, the Magistrate concludes from Altech's possession of the copies, and ISC's detailed analysis of them, that the copies were made by Altech. Accordingly, ISC has proven infringement of its copyrighted

---

**8.** I conclude that creating programs such as IDOS which make computers work is one of the most complex, painstaking even exasperating jobs in the computer industry.

IDOS program and related utilities as a matter of law.

21. Furthermore, the Magistrate concludes that Altech's infringements were willful, since the evidence shows that Altech knew IDOS was copyrighted by ISC, and in addition, knew that it had no authority to make copies of IDOS.

(iii). *contributory infringement—unauthorized distribution of ISC's copyrighted works*

22. Altech testified that it has an established business practice whereby it systematically searches each item of used ISC equipment it purchases or brokers in an effort to locate ISC software. When Altech finds ISC software, Altech immediately analyzes it to determine whether to keep it for use in Altech's business operations.

23. The evidence shows that ISC's software is copyrighted, and that ISC does not sell its copyrighted software to customers. Rather, ISC distributes its software pursuant to written licensing agreements, which expressly provide that ISC retains ownership of its software, and precludes the licensees from redistributing it. For this reason, even if Altech had "found" (instead of "copied") all the versions of IDOS that it distributed to its employees for their use, its conduct would still be unlawful. As discussed immediately below, Altech cannot invoke the "first sale doctrine" to provide legal cover for its use of ISC copyrighted software,[9] which it obtained in violation of ISC's license agreements.

### the first sale doctrine

■ 24. In particular, the so-called "first sale" doctrine only applies when the copyright holder has sold the works in question. 17 U.S.C. § 109(a), (d). In essence, the doctrine creates a limited exception to one of the exclusive rights of a copyright holder, that of distributing its work. If the copyright holder sells a copyrighted work, he loses his right under the copyright laws to control the subsequent distribution of that particular copy of the work.

25. Conversely, a copyright holder does not lose his right to control distribution of copies of his work that have never been sold. Thus, given the substantial evidence that ISC only licensed and did not sell its copyrighted software, the first sale doctrine has no application to Altech as a matter of law. 17 U.S.C. § 109(d).

### violations of ISC's licensing agreement

26. Consequently, Altech has no authority to possess ISC's software. Any such authority must come from ISC, who, as the copyright holder, has the exclusive right to control distribution of its software. *Major League Baseball Promotion v. Colour-Tex, Inc.,* 729 F.Supp. 1035, 1041 (D.J. 1990); *American International Pictures,* 576 F.2d at 664. But as just discussed, ISC, through its licensing agreements, has specifically limited distribution to licensed customers only, and proscribed any further distribution of its software. Therefore, Altech has no lawful right to possess ISC software, and has acquired no title to or other rights in that software. *Ibid.*

27. This is true even if Altech had come into possession of ISC software in good faith, and without knowledge that distribution to it was unauthorized. Simply put, there is no such thing as a bona fide purchase for value in copyright law. *Major League Baseball Promotion,* 729 F.Supp. at 1042; *American International Pictures,* 576 F.2d at 664. In any event, as the Court found above, Altech knew or should have known it had no authority to possess ISC's copyrighted software.

### Altech's contributory infringements

■ 28. Under settled copyright law, any violation of a copyright licensing agreement constitutes an act of infringement. *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989); *Major League Baseball Promotion,* 729 F.Supp. at 1041–42.

29. Thus, an ISC customer that re-distributes ISC software (to Altech, for exam-

---

**9.** Altech does not contend that its acquisition and distribution of ISC's Guide is protected by

the first sale doctrine. Altech admitted that it copied the Guide.

ple) is not only violating its licensing agreement, but is also guilty of infringement. Altech is equally liable for the customer's infringement as a "contributory infringer," since Altech knew (or should have known) that ISC's software is licensed, not sold, and that ISC customers have no authority to distribute ISC's copyrighted software to Altech or anyone else. *Wales Industrial, Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 518 (S.D.N.Y.1985). *Harrison v. Maynard, Merril & Co.,* 61 F. 689, 690–91 (2nd Cir.1894). And, it is no defense for Altech to argue, as it did in its pre-hearing brief at p. 9, that "ISC's Complaint is really with its customers who sell the ... disks in violation of its licensing agreements." The law is clear that ISC may sue any one or more of the participants in infringing activity, as it sees fit. *Costello Publishing Co. v. Rotelle,* 670 F.2d 1035, 1043 (D.C.Cir.1981).

30. In consequence, each and every time Altech obtains and uses ISC's copyrighted software, it is guilty of copyright infringement.

(iv). *copying of ISC's copyrighted software programs by using them in a computer*

■ 31. Altech's possession of ISC software not only constitutes "contributory infringement," its subsequent use of that software, be it to diagnose and repair customer equipment, refurbish used equipment (so-called "hot-staging"), or otherwise, comprises additional acts of *direct infringement* by Altech. This is because in order to use an ISC software program, the program must be "loaded" into a computer's memory. Loading a computer's memory requires "copying" of the program from a disk into memory, and that copy is a direct infringement of the copyright. *Nimmer On Copyright,* § 8.08 (1989).

32. Therefore, whenever Altech uses ISC's copyrighted software, it necessarily makes an unauthorized copy of that software, and necessarily infringes ISC's copyright. *Bly v. Banbury Books, Inc.,* 638 F.Supp. 983, 985 (E.D.Pa.1986). *Micro–Sparc, Inc. v. Amtype Corp.,* 592 F.Supp. 33, 35 (D.Mass.1984).

■ 33. Nor can Altech escape its liability for these direct "use" infringements by resort to 17 U.S.C. § 117. That section gives the *lawful* owner of copyrighted software the limited right to make certain types of copies of the software for its own internal use on its own machines. *Apple Computer, Inc. v. Formula International, Inc.,* 594 F.Supp. 617, 621–23 (C.D.Cal. 1984); *Tandy Corp. v. Personal Micro Computers, Inc.,* 524 F.Supp. 171, 174 (N.D.Cal.1981). Section 117 affords no immunity whatsoever to infringers such as Altech that have come into unauthorized possession of the software. *GCA Corp. v. Chance,* 217 U.S.P.Q. 718, 720 (N.D.Cal. 1982).

34. Moreover, even if § 117 did apply (which it does not) Altech's conduct in making multiple copies of ISC software, and using that software, at least in part, on other peoples machines, falls outside the scope of Section 117's limited exception to infringement liability. *Apple Computer,* 594 F.Supp. at 621–23.

(c). *Balance Of Hardships And The Public Interest*

35. The impact that an injunction would have on Altech's business merits little equitable consideration, since the evidence shows that Altech has knowingly engaged in infringing activities as a regular feature of its business. *Atari,* 672 F.2d at 620; *Apple Computer,* 714 F.2d at 1255. Moreover, Altech testified that the repair and refurbishment of ISC equipment was a minor part of its overall business.

36. In contrast, ISC will greatly benefit from an injunction. An injunction will provide much needed protection for, and help reduce the erosion in the value of, ISC's copyrighted works, and will allow ISC to recover the substantial investment it made in order to create the works in the first instance.

37. Consequently, the Court finds that the balance of hardships weighs heavily in favor of ISC and the issuance of a preliminary injunction.

38. The public interest also strongly favors the issuance of a preliminary injunc-

tion, as it will preserve the integrity of the copyright laws, which embody an important national policy of encouraging creativity. *Atari*, 672 F.2d at 620; *Apple Computer*, 714 F.2d at 1254.

39. ISC has met all the prerequisites to preliminary injunctive relief on its copyright claims. Under the sliding scale analysis, all of the relevant factors weigh decidedly in favor of the issuance of a preliminary injunction.

## D.

### TRADE SECRET CLAIMS

(a). *Likelihood Of Success On The Merits*

■■■ 40. ISC has established a strong likelihood of success on the merits of its trade secret claims against Altech.

41. The requisites for a "trade secret" are set forth in the Uniform Trade Secrets Act as follows:

"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons, who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Ill.Rev.Stat. ch. 140 ¶ 352(d)

42. Based on the Findings, the Court concludes that the following constitute trade secrets of ISC: ISC's IDOS and related utilities programs, ISC's operating systems programs, ISC's Guide, ISC's technical bulletins, ISC's service manuals, and the information and procedures set forth therein that pertain to the installation, service, maintenance, diagnosis and repair of ISC's computer systems. Courts have routinely held that such items constitute protectable trade secrets. *Technicon Medical*

*Information Systems Corp. v. Green Bay Packaging, Inc.*, 687 F.2d 1032, 1033, 1038 (7th Cir.1982), *cert. denied*, 459 U.S. 1106, 103 S.Ct. 732, 74 L.Ed.2d 955 (1983) (computer service manual); *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 13 U.S.P.Q.2d 1397, 1401 (S.D.N.Y.1989) (computer programs); *Data General Corp. v. Digital Computer Controls, Inc.*, 357 A.2d 105, 110 (Del.Ch.1975) (computer maintenance manual).

43. The Court concludes that ISC derives and will continue to derive economic value from the exclusive use of its trade secrets. *Telerate Systems, Inc. v. Caro*, 689 F.Supp. 221, 232 (S.D.N.Y.1988) ("Even a slight competitive edge will satisfy this [economic value] requirement of trade secret protection.").

44. Based on the Findings, the Court concludes that, but for those like Altech who have improperly obtained them, ISC's trade secrets are not generally known. ISC's efforts to maintain the confidentiality of its trade secrets have been reasonable, and have successfully preserved their trade secret status. *Data General Corp.*, 357 A.2d at 110–11; *Continental Data Systems, Inc. v. Exxon Corporation*, 638 F.Supp. 432, 443 (E.D.Pa.1986); *Technicon Data Systems Corp. v. Curtis 1000, Inc.*, 224 U.S.P.Q. 286, 290 (Del.Ch.1984); *Television Telecommunication Systems, Inc. v. Saindon*, 169 Ill.App.3d 8, 119 Ill.Dec. 500, 507, 522 N.E.2d 1359, 1366 (1988); *O–Co Industries, Inc. v. Hoffman*, 625 F.Supp. 608, 617–618 (S.D.N.Y.1985); *Computer Print Systems, Inc. v. Lewis*, 281 Pa.Super. 240, 422 A.2d 148, 155 (1980) ("[I]n light of the reasonable assumption that its employees and officers would abide by their obligation not to disclose its trade secrets, we cannot conclude that appellee's failure to employ more elaborate precautions to prevent disclosure precludes continued attachment of trade secret protection."); *Digital Development Corp. v. International Memory Systems*, 185 U.S. P.Q. 136, 140 (S.D.Cal.1973) ("Defendant used sufficient means for keeping its design secret by following the industry practice of stamping a proprietary legend on

instruction manuals before they were sent to customers."); *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1117 (E.D.Mich.1975) ("Although SDRC did not use the ultimate in policing measures, the professional calibre of its employees, and the nature of its development work made heavy-handed measures unnecessary. Moreover, the confidential nature of development work was specifically called to each employee's attention in his individual confidential disclosure agreement.").

45. ISC's partial disclosures to third parties who are under obligations of confidentiality do not alter the trade secret status of ISC's computer programs, compilations, technical information and procedures. *Televation Telecommunication Systems*, 119 Ill.Dec. at 506, 522 N.E.2d at 1365 (2nd Dist.1988); *Technicon Data Systems Corp.*, 224 U.S.P.Q. at 290; *Smith v. Dravo Corp.*, 203 F.2d 369, 376 (7th Cir. 1953); *Digital Development Corp.*, 185 U.S.P.Q. at 141 ("Because of the complexity of the item and the general practice and custom of the trade, the sale or marketing of an item does not necessarily destroy its trade secret aspect."); *Data General Corp.*, 357 A.2d at 107–08, n. 5 (Dissemination of drawings containing trade secrets to even as many as 6,000 persons "is not significant if in confidence.").

46. Based on the Findings, the Court rejects Altech's contention that ISC's trade secrets were not sufficiently confidential, or that Altech did not know that ISC considered and treated its computer programs, compilations, technical information and procedures as confidential. Altech intentionally obliterated ISC's "proprietary" legends from the Guide before copying and disseminating it. The principals of Altech, Messrs. Fries and Beyer, are both former ISC employees who not only signed their own confidentiality agreements with ISC, but received training at ISC predicated on manuals and other materials which contained confidentiality designations. In addition, Altech has approximately 20 other ex-ISC employees who each executed a confidentiality agreement, received extensive training from confidential materials, and were otherwise given access to ISC documentation marked "proprietary," with detailed legends explaining the meaning of that term. Moreover, Altech itself safeguarded the confidentiality of the ISC-generated materials in its possession by, *inter alia*, refusing to give them to competitors, and requiring confidentiality agreements from its own employees and customers.

47. Under such circumstances, Altech was on notice that ISC's computer programs, service related materials and technical information were confidential. *Technicon Data Systems Corp.*, 224 U.S.P.Q. at 291; *Integrated Cash Management Service*, 732 F.Supp. 370, 13 U.S.P.Q.2d at 1403 ("The existence of a nondisclosure agreement puts the employee on notice that the programs are considered trade secrets."); *Structural Dynamics Research Corp.*, 401 F.Supp. at 1116 ("Confidentiality of information can be determined from the manner in which defendants themselves treated the information prior to the litigation."); *Telerate Systems*, 689 F.Supp. at 232 ("Caro's steadfast denials of knowledge of the secrecy of the STP is curious when it is considered that the document he authored for Telerate, which describes in detail the STP, bears a legend that the information therein contained is proprietary in nature and may not be reproduced without the express consent of Telerate."); *Digital Development Corp.*, 185 U.S.P.Q. at 141; *A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 16 (2nd Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968) (Use of improper means to obtain trade secrets is evidence of their confidentiality).

(b). *Irreparable Harm*

48. Altech has misappropriated ISC's trade secrets for its own use, and is likely to continue to misappropriate, use and disclose those trade secrets unless enjoined by this Court. Ill.Rev.Stat. ch. 140 ¶ 352(b). Accordingly, ISC has demonstrated irreparable harm for which it has no adequate remedy at law. *Technicon Data Systems*, 224 U.S.P.Q. at 292–93; *Com–Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp.

1229, 1239 (E.D.Mich.1971), *aff'd per curiam*, 458 F.2d 1341 (6th Cir.1972); *Integrated Cash Management*, 732 F.Supp. 370, 13 U.S.P.Q.2d at 1403.

#### (c). *Balance Of Hardships And Public Interest*

49. The balance of hardships favors ISC. Without an injunction it stands to lose the value of its trade secrets which have been developed at enormous cost over many years. Altech has no equitable standing to complain of being deprived of the use of information, manuals, software and procedures that it had no right to use and appropriate in the first instance. Altech made no investment in generating those materials and information, and knew that the ISC employees it hired were obligated to keep all such matters confidential. *Technicon Data Systems*, 224 U.S.P.Q. at 292; *Com–Share*, 338 F.Supp. at 1239.

50. The public interest favors the issuance of an injunction. The purpose behind the Uniform Trade Secrets Act is to foster the development of new technology. Ill.Rev.Stat. ch. 140 ¶ 351 *et seq.* That purpose is achieved by protecting the investment of companies like ISC that undertake to do so. *TechniCAL, Inc. v. AllPax Products, Inc.*, 1990 WL 41924 at 8, 1990 U.S.Dist.LEXIS 3712 at 13 (E.D.La.1990).

51. ISC has met all the prerequisites to preliminary injunctive relief on its trade secret claims. Under the sliding scale analysis, all of the relevant factors weigh decidedly in favor of the issuance of a preliminary injunction.

#### E.

#### TORTIOUS INTERFERENCE WITH CONTRACT

52. ISC also seeks preliminary injunctive relief to restrain Altech from inducing breaches of ISC's employment agreements. The elements of the tort of interference with contract are well established: (i) the existence of a valid and enforceable contract; (ii) defendant's awareness of the contract; (iii) defendant's inducement of a breach of the contract; and (iv) a subsequent breach of the contract. *HPI Health Care v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 23, 545 N.E.2d 672, 676 (1989).

#### (a). *Likelihood Of Success On The Merits*

53. The Court finds that ISC has made a strong showing of a likelihood of success on the merits of its tortious interference claims against Altech.

(1). The confidentiality and restrictive covenant in ISC's employment agreement is valid and enforceable.

54. The evidence shows that ISC has a standard employment agreement which it requires each of its employees to execute as a condition of employment.

55. ISC's standard employment agreement contains a confidentiality and restrictive covenant that is described in the Findings, ¶¶ 39 and 40, *supra.* The agreement also provides that it is to be governed by the laws of the State of Washington.

(i). *the validity of the confidentiality and restrictive covenant in ISC's employment agreement must be determined under Washington law.*

56. Since the parties to ISC's employment agreement have chosen Washington law, under Illinois conflicts principles, the parties' choice will ordinarily be honored, unless the law of the chosen state is repugnant to a strong and fundamental policy of Illinois. *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill.App.3d 755, 109 Ill.Dec. 90, 93, 509 N.E.2d 751, 754 (1987).

57. The Court concludes that Washington law concerning the enforcement of a confidentiality and restrictive covenant, although not identical to Illinois law, is entitled to be enforced under Illinois conflicts of law principles. Washington law is not repugnant to a fundamental policy of Illinois. *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1081 (7th Cir. 1986).

58. Moreover, an employer like ISC, which has employees in virtually ever state in the union, has a strong interest in having its employment agreements uniformly

construed under one state's law. *Sarnoff*, 798 F.2d at 1082. Therefore, it is perfectly reasonable to have ISC's employment agreements governed by the law of its headquarters state, Washington. *Ibid; Janice Doty Unlimited, Inc. v. Stoecker*, 697 F.Supp. 1016, 1020 (N.D.Ill.1988)

(ii). *ISC's confidentiality and restrictive covenant protects legitimate business interests of ISC.*

59. Under Washington law, a restrictive covenant is valid and enforceable to protect the business and good will of the employer, including (i) the employer's investment in employee training, *Wood v. May*, 73 Wash.2d 307, 438 P.2d 587, 589–90 (1968); (ii) confidential information and trade secrets, *Perry v. Moran*, 109 Wash.2d 691, 748 P.2d 224, 230 (1987); *Central Credit Collection Control Corp. v. Grayson*, 7 Wash.App. 56, 499 P.2d 57, 58 (1972); and (iii) customer relationships, *Knight, Vale and Gregory v. McDaniel*, 37 Wash.App. 366, 680 P.2d 448, 452 (1984).

60. ISC introduced substantial evidence that it possesses all three types of interests. Accordingly, the Court concludes that ISC's employment agreement, as applied to the Altech ex-ISC employees, protects legitimate business interests of ISC.

(iii). *ISC's confidentiality and restrictive covenant is reasonable in scope.*

61. Washington law also provides that the scope and duration of a restrictive covenant must be reasonably related to the business interests that the covenant is designed to protect. *Perry*, 748 P.2d at 228. However, a restrictive covenant that is unduly broad in scope or duration is not thereby rendered invalid. *Wood*, 438 P.2d at 590. Instead, under Washington law, the trial court is directed to modify the reach of an overly broad covenant and to enforce it to the extent the court finds reasonable. *Wood*, 438 P.2d at 591–92; *Sheppard v. Blackstock Lumber*

*Co., Inc.*, 85 Wash.2d 929, 540 P.2d 1373, 1377 (1975).

62. ISC's employment agreement is not unreasonably broad in geographic reach. This is because ISC equipment is in place at banks and savings & loans throughout the country. As such, the potential for field service employees, like the Altech ex-ISC employees, to use ISC confidential information, has no geographic boundary. Consequently, a confidentiality and restrictive covenant that was anything less than national in scope would provide ISC with inadequate protection. *Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068, 1073 (S.D.N.Y.1984); *Sigma Chemical Co. v. Harris*, 586 F.Supp. 704, 710 (E.D.Mo.1984).

63. This conclusion is fully consistent with Washington law. Its courts have consistently recognized that the employer is entitled to a restrictive covenant that is as broad in scope as the business which the covenant seeks to protect. *Central Credit Collection Control Corp.*, 499 P.2d at 59. Moreover, the Washington Supreme Court has specifically acknowledged that an activity covenant like ISC's, is less restrictive on the employee than a covenant with a blanket geographic proscription. *Perry*, 748 P.2d at 229–30. For example, ex-ISC employees are not contractually obliged to leave the geographic region in which they had been working in order to continue in the computer service business. Indeed, they are even free to compete with ISC in that region, so long as they do not use, or take employment that calls upon them to use ISC confidential information or trade secrets.[10]

(iv). *ISC's confidentiality and restrictive covenant is reasonable in duration.*

64. ISC's covenant contains an "event-determined" duration. It lasts only so long as the information or trade secrets to which the employee had access remain confidential. This is a practical limitation,

---

10. The Magistrate also notes that under Washington law, an employee has a common law duty not to use or disclose confidential information of the employer, which closely parallels the contractual duty of confidentiality in ISC's employment agreement. *Pacific Title Inc. v. Pioneer National Title Insurance Co. Inc.*, 33 Wash. App. 874, 658 P.2d 684, 688 (1983). This common law duty has no geographic limitation.

given the wealth of confidential information which a high-tech company like ISC is continually developing, and the exposure and access to that information continually provided to certain of ISC's employees. Indeed, under these circumstances, it would be largely arbitrary to require ISC to establish a pre-determined, numerically fixed duration to its restrictive covenant.

65. Accordingly, this Magistrate concludes that ISC has made a good faith effort to provide a meaningful duration for its confidentiality and restrictive covenant. In addition, a duration tied to the protectability of confidential information is consistent with the common law duty of an employee not to disclose confidential information, which is "temporally unlimited." *Sigma Chemical Co.*, 586 F.Supp. at 710.

66. Nevertheless, some courts insist that a restrictive covenant contain a numerically specific length of time to be reasonable. *See, e.g. Telxon Corp. v. Hoffman*, 720 F.Supp. 657 (N.D.Ill.1989) (Illinois law). The Washington courts have not addressed this precise question. *Cf. Sheppard*, 540 P.2d at 1376.

67. For present purposes, however, this Magistrate need not resolve the issue. Because it is clear under Washington law that where a restrictive covenant is found to have an unreasonable duration, it may be modified by the trial court, who should determine a reasonable length, and then enforce the covenant as modified. *Alexander & Alexander, Inc. v. Wohlman*, 19 Wash.App. 670, 578 P.2d 530, 539–40 (1978); *Sheppard*, 540 P.2d at 1377.

68. Here, the only matter before the Magistrate is ISC's motion for preliminary injunction. ISC has introduced substantial evidence that the life of the confidential information and trade secrets to which Altech's ex-ISC employees had access will extend well beyond the likely time for the trial of this action.

69. A substantial amount of ISC's technical information has remained confidential for in excess of five years. Moreover, given ISC's experience during the past twelve years, it apparently takes more than two years to develop the next generation of its computer systems; and when ISC does so, its prior systems remain commercially viable, and the technical information and trade secrets associated therewith remain confidential and very valuable.

70. Accordingly, in the specific context of this preliminary injunction hearing, this Magistrate does not have to further consider whether a modification of the duration of ISC's restrictive covenant would be appropriate. That issue is best left to the trial court, who after a full hearing on the merits can determine whether modification of the covenant's duration would be appropriate for purposes of permanent injunctive relief.

71. To ensure that a preliminary injunction based on interference with ISC's covenant will not extend beyond a reasonable length, without further review by the trial court, that portion of the preliminary injunction will continue in effect for no more than two years. Assuming trial on the merits has yet to occur, ISC will then have the right to seek an extension of the two year preliminary injunction period, based upon a renewed showing that the confidential information and trade secrets in question have retained their vitality, and otherwise remain legally protectable.

72. By thus conditioning the preliminary injunction, this Magistrate is making no legal conclusion concerning the appropriate duration of ISC's covenant, beyond the conclusion that ISC has shown that a duration of *at least* two years is reasonable. This Magistrate believes that the procedure I recommend fairly balances the rights of the parties, and if anything, affords Altech substantially more protection than the law requires. *See, e.g., SI Handling Systems Inc. v. Heisley*, 581 F.Supp. 1553, 1570 (E.D.Pa.1984), *aff'd in part, vacated in part on other grds.*, 753 F.2d 1244 (3rd Cir.1985) (defendant seeking to terminate preliminary injunction has burden of showing that confidential information no longer protectable); *Cf. Uniform Trade Secrets Act*, Ill.Rev.Stat. Ch. 140 ¶ 353 (burden on defendant to apply for termination of trade secret injunction when trade secret has ceased to exist).

**1338**

*(v). ISC's confidentiality and restrictive covenant does not unduly injure its employees or the public.*

73. The evidence shows that ISC's confidentiality and restrictive covenant does not impose an undue hardship on ex-employees or the public.

74. As for Altech's ex-ISC employees, their job prospects are not substantially curtailed. They are only precluded from using the special technical knowledge they gained from ISC, or from taking a competitive position that would inherently call upon them to use that special knowledge. As a practical matter, this leaves the entirety of the computer industry, except for the servicing of ISC computer systems, immediately open to them. From this, this Magistrate concludes that any injury to the ex-employees from the enforcement of ISC's covenant will be minimal, and reasonable under the circumstances. *Knight, Vale and Gregory,* 680 P.2d at 452.

75. Nor is there any evidence that the public would be unduly injured by enforcement of ISC's covenant against the Altech ex-ISC employees. Their general knowledge and skills are not unique, or incomparable. *Knight, Vale and Gregory,* 680 P.2d at 452. And, the public has no right to their special knowledge as it is comprised of confidential information and trade secrets of ISC. Accordingly, the Magistrate concludes that the enforcement of ISC's covenant will not unreasonably injure the public.

*(2). Altech was aware of ISC's employment agreement.*

76. ISC introduced substantial evidence to show that Altech was aware of ISC's employment agreements. Accordingly, the Magistrate concludes that ISC has satisfied the awareness element of its tortious interference claim against Altech.

(3). Altech has repeatedly induced breaches of ISC's employment agreement, and those agreements continue to be breached.

77. ISC introduced substantial evidence to show that Altech repeatedly hired ex-ISC employees to work on the installation, service, and repair of ISC computer systems and their component parts. In so doing, Altech sought to appropriate and exploit their ISC training, and their knowledge of ISC confidential information and trade secrets. *Certified Laboratories of Texas, Inc. v. Rubinson,* 303 F.Supp. 1014, 1025 (E.D.Pa.1969); *Telex Corp. v. IBM,* 510 F.2d 894, 910, 928–29 (10th Cir.), *cert. denied,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

78. ISC introduced substantial evidence that the Altech ex-ISC employees have, and are continuing to use and disclose confidential information and trade secrets of ISC for Altech's benefit. They have been, and are presently employed in positions with Altech that inherently call upon them to use and disclose such training, confidential information and trade secrets. *Electronic Data Systems Corp. v. Powell,* 524 S.W.2d 393, 398 (Tex.App.1975); *Integrated Cash Management Services,* 732 F.Supp. 370, 13 U.S.P.Q.2d at 1401, 1403.

(4). Altech cannot avoid its liability by claiming that ISC's employment agreements are unenforceable as "adhesion contracts."

79. Altech cannot avoid its liability for interference with ISC's employment agreements by characterizing them as "adhesion" contracts. Under Washington law, and contrary to Altech's contention, the mere fact that an employer requires a restrictive covenant to be executed at the onset of employment, or thereafter, does not constitute the requisite "fraud," deceit," or "coercion" necessary to void the agreement. Continued employment and training are, of themselves, sufficient consideration under Washington law to support a restrictive covenant. *Wood,* 438 P.2d at 589; *Knight, Vale and Gregory,* 680 P.2d at 450–51; *Alexander & Alexander,* 578 P.2d at 536 ("Wohlman had the free choice of either signing the [employment] agreement [containing a post-employment restrictive covenant] or not signing it. He could have refused to sign the agreement, taken his clients and gone into business for himself."); *Columbia Bank, N.A. v. New Cascadia Corp.,* 37 Wash.App. 737, 682 P.2d 966, 968 (1984); *National Bank of Washington v. Equity Investors,* 81 Wash.2d 886, 912, 506 P.2d 20 (1973)

("One cannot, in the absence of fraud, deceit, or coercion be heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose contents he was in law bound to understand.")

■ 80. Moreover, under Washington law, an attack on a contract based on duress or coercion must be made by the purported "victim," not a third-party (such as Altech) who seeks to benefit from voiding the contract. Here, no ex-ISC employee even attempted to demonstrate that his employment contract had been imposed upon him by impermissible coercion or duress. To the contrary, the evidence showed that any such attack would have been particularly unavailing in the present circumstances. Restrictive covenants are common in the computer industry, and no employee would be legitimately surprised (let alone "deceived") by an employer's request for a restrictive covenant as a condition to starting employment or continued employment. ISC's employees were, in fact, exposed to extensive confidential and trade secret information, and were given extensive training. Still further, these same employees, after leaving ISC, and consistent with common expectation in the industry, signed new restrictive covenants with Altech upon joining that company. *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wash.2d 939, 640 P.2d 1051, 1054 (1982); *Perry*, 748 P.2d at 229–30.

(b). *Irreparable Injury*

81. Irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement or a restrictive covenant. *Business Intelligence Services*, 580 F.Supp. at 1072; *Healthcare Affiliated Services, Inc. v. Lippany*, 701 F.Supp. 1142, 1156 (W.D.Pa.1988). Among other things, disclosure and use of the ex-employer's confidential information and trade secrets destroys the value of that information, permits the new employer to gain an unfair competitive advantage, and diminishes the ex-employer's competitive standing. *Business Intelligence Services*, 580 F.Supp. at 1072; *Healthcare Affiliated Services, Inc.*, 701 F.Supp. at 1156.

82. Moreover, it is often difficult to detect illicit disclosure and use of confidential information, or to determine the monetary damages suffered thereby. *Business Intelligence Services*, 580 F.Supp. at 1072.

83. In addition, in the present case, the extensive and continuing nature of Altech's interference with ISC's employment agreements intensifies and compounds the irreparable nature of ISC's injury. *Certified Laboratories of Texas*, 303 F.Supp. at 1029.

(c). *Balance of Hardships And Public Interest*

84. ISC is not only suffering irreparable injury as discussed above, but there is a significant threat that Altech will continue to use ex-ISC employees in violation of their respective covenants, and to raid ISC for still more new employees. Altech's conduct will thus continue to jeopardize ISC's investment in training, and the development of confidential information and trade secrets concerning the service, maintenance, and improvement of ISC computers systems.

85. By contrast, Altech has testified that the servicing of ISC equipment is a minor part of its overall business. Moreover, any hardship that Altech does sustain will be the result of an extensive hiring program which deliberately targeted ISC employees, irrespective of their contractual and fiduciary duties to ISC. This hardship is entitled to little weight. *Healthcare Affiliated Services*, 701 F.Supp. at 1156. Consequently, the Magistrate concludes that Altech will not suffer undue hardship from an injunction barring its current employees from servicing ISC equipment.

86. Nor does the public have an interest in protecting an employer who systematically induces a competitor's employees to disregard their contractual and fiduciary duties in order to misappropriate the competitor's confidential information and trade secrets. *Telex*, 510 F.2d at 929–30. The public interest is best served by upholding the integrity of ISC's contract rights. *Healthcare Affiliated Services*, 701 F.Supp. at 1156.

87. According, ISC has met all of the prerequisites to preliminary injunctive relief on its interference with contract claims. The Magistrate finds that under the sliding scale analysis, all of the relevant factors weigh heavily in favor of the issuance of a preliminary injunction.

It is recommended that the Court issue a preliminary injunction order in form as attached.