**WESELEY SOFTWARE
DEVELOPMENT
CORP.**

v.

**Wesley BURDETTE, Manugistics Group,
Inc., and Manugistics, Inc.**

**Civ. No. 3:96CV1988 (DJS).**

United States District Court,
D. Connecticut.

April 21, 1997.

A. Robert Fischer, Guilford, CT, William G. Madsen, Hartford, CT, for Plaintiff.

David P. Atkins, William Wenzel, Michael N. Lavelle, Pullman & Comley, Bridgeport, CT, for Defendants.

SQUATRITO, District Judge.

Upon review and pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 2 of the Local Rules for the United States Magistrate Judges (D.Conn.), Magistrate Judge Fitzsimmons' Recommended Ruling is **APPROVED** and **ADOPTED** as the ruling of this Court by stipulation.

It is so Ordered.

### RULING ON PRELIMINARY INJUNCTION

FITZSIMMONS, United States Magistrate Judge.

Weseley Software Development Corporation ("Weseley") seeks a preliminary injunction against Wesley Burdette ("Burdette"), Weseley's former Senior Logistics Analyst, to prevent him from violating the non-compete provision of his Employment Agreement and the provisions of a Confidentiality Agreement by commencing employment with his

new employer, Manugistics Inc.,[1] Weseley's principal competitor.

In a Stipulated Restraining Order [Doc. # 11] entered into on September 27, 1996, defendants Manugistics, Group, Inc. and Manugistics, Inc. agreed, among other things, not to "receive any employment related services from Wesley Burdette," and to instruct Burdette "not to perform any employment related activities for Manugistics, Inc." until a "hearing on Plaintiff's motion for Preliminary Injunction has been held and a decision tendered thereon." [Doc. # 11 at 1]. Weseley agreed to "reimburse Manugistics for the reasonable salary payments made to Weseley Burdette during said period." *Id.* at 2.

Since the injunction hearing has not been consolidated with a trial on the merits, the only issue pending is whether the Court recommends the granting of a preliminary injunction. For the reasons that follow, the Motion for Preliminary Injunction [Doc. # 8] is GRANTED.

Testimony and evidence adduced at the hearing are summarized below as necessary to explain the Court's findings and conclusions.

## I. *FINDINGS OF FACT*

Based on the credible testimony, the exhibits, and the entire record developed during the evidentiary hearings on November 12, 13, 18 and 19, 1996, the Court finds the following facts established for the purposes of the injunction proceedings.

1. Weseley is a Connecticut corporation with its principal place of business in Shelton, Connecticut. [Compl. ¶ 1]

2. Weseley is a software development company that designs, develops, manufactures, markets, sells, services and supports transportation and logistics management software. Transportation and logistics management software is a product that allows shippers to determine the most efficient manner to deliver goods from one place to another. [Plaintiff's Proposed Findings of Fact and Conclusions of Law, (hereafter "Pl."), ¶ 2]

3. Weseley's primary product is a transportation and logistics management program called TRACS (Tactical Routing and Consolidation System). [Pl. ¶ 3]

4. Weseley has customers throughout the United States and parts of Canada and competes throughout the United States and Canada with firms designing, developing, manufacturing, marketing, selling, servicing and supporting transportation and logistics management software. [Compl. ¶ 9]

5. Defendants Manugistics Group, Inc. and Manugistics Inc. are Delaware corporations with their principal place of business in Rockville, Maryland. [Compl. ¶ 3]

6. Manugistics produces a transportation and logistics management software product known as "Manugistics' Transportation Planning" ("MTP"). [Pl. ¶ 6]

7. TRACS and MTP are the primary competitors in the transportation and logistics management software industry. [Pl. ¶ 7, Stipulation Doc. # 46]

8. In 1996, Weseley will invest approximately $1.5 million in research and development and $3 million in 1997. [Pl. Post–Trial Mem. at 57–58]

9. In March, 1996, Weseley released a new client-server version of TRACS, referred to as TRACS 3.0. It released an update, TRACS 3.1, in October, 1996. [Pl. 110]. TRACS 3.2 has a projected release date of March, 1997.

10. Burdette was significantly involved in the development and testing of both TRACS 3.0 and 3.1. [Pl. ¶ 11]

*Burdette's Employment History*

11. Burdette holds a B.S. degree from the University of Tennessee in Business Administration. [Pl. 112]

12. Before joining Weseley, Burdette worked briefly as a logistics analyst with Nabisco in Morristown, New Jersey. [Pl. ¶ 14]

---

1. A stipulation of dismissal for Manugistics Group, Inc. was on November 12, 1996. [Doc. # 45].

13. Burdette was offered employment at Weseley Software as a Logistics Analyst in May, 1993, and was later promoted to the position of Senior Logistics Analyst. [Pl. ¶ 14]

14. Burdette was one of Weseley's first ten employees. Weseley has had relatively·informal employment practices which encouraged the free exchange of information and ideas among its employees. [Pl. Post–Trial Mem. at 10–11]

15. Weseley currently employs approximately sixty (60) people.

16. As a Logistics Analyst and later as Senior Logistics Analyst, Burdette was responsible for working with customers and potential customers to evaluate, develop, tailor, and implement Weseley's products. [Pl. ¶ 29]

17. During his employment with Weseley, Burdette had access to confidential information regarding:

    a. methods and processes utilized to build Weseley's logistics management software;

    b. research and development efforts regarding Weseley's logistics management software;

    c. methods of evaluating the needs of potential customers regarding Weseley's logistics management software;

    d. pricing for services provided to customers, and pricing strategy in marketing TRACS;

    e. sales and marketing plans;

    f. methods for implementing Weseley's transportation and logistics management software.

    g. the direction Weseley is taking in its new products; and

    h. competitive strategies for its customers, and against its major competitor Manugistics, and other competitors in the transportation and logistics management software industry.

2. Steven Diaz is Manager of Human Resources at Weseley Software.

3. The east region at Manugistics is roughly defined as "everything east of Chicago," including the eastern part of Canada [Byrnes Depo. 6–7].

[Pl. ¶¶ 29, 30]

18. Weseley considers the following information as confidential and proprietary:

    a. the design of the product

    b. how the product works

    c. how Weseley solves clients' problems

    d. the manner of implementing the software

    e. research and development plans

    f. sales and marketing plans and strategy

    g. prices charged for the TRACS products

    h. names of potential customers

    I. the TRACS source code

[Pl. Post–Trial Mem. at 11–12]

19. On August 29, 1996, Burdette tendered his resignation from Weseley, effective September 16, 1996, having accepted a position at Manugistics in a pre-sales capacity in connection with the marketing and sales of MTP. [Pl. ¶¶ 31, 40]

20. On September 4, 1996, Burdette returned to Weseley to meet with Steven Diaz.[2] Diaz paid Burdette for the period ending September 16, 1996, and asked Burdette to acknowledge receipt of a letter regarding, inter alia, the non-compete provisions of his employment agreement. [Pl. ¶ 34]

21. Manugistics hired Burdette as a Business Development or Pre-sales Consultant in the east region[3] in transportation planning. A pre-sales consultant works with sales opportunities, gives product demonstrations and return on investment presentations, makes detailed business requirement surveys, and educates prospects on supply chain management concepts. [Ex. 34, Byrnes Depo. 4–5, 11, 25, 28, 30]. A portion of the job description, "[p]osition the Manugistics solution against competitors," requires that a pre-sales consultant "understand what the competitors' strengths are and try to position [Manugistics'] strengths instead of [its] weaknesses."[4] [Byrnes Depo. 29].

4. Michael Scott Byrnes, Manager of Business Development for the east region at Manugistics explained,

    Q: And if [a potential customer] asked you questions about your competitors, you need to

22. Keith Enstice, Senior Vice President of Field Operations for Manugistics, testified that Manugistics employees may use "[a]nything that's not confidential and proprietary that's in the public domain." [Pl. Post–Trial Mem. at 17].

23. Michael Scott Byrnes, who supervises the pre-sales consultants at Manugistics, including the position Burdette was hired to fill, testified that Burdette could disclose "[a]ny information that he has that can help our sales cycle that's not confidential or unethical to disclose." [Pl. Post–Trial Mem. at 17]. Mr. Byrnes also testified that he does not consider Burdette's opinion of Weseley Software's product to be proprietary information. [Tr. 11/19/96 at 25].

24. At Manugistics, the determination of what is or is not confidential information is made by the employee. [Tr. 11/13/96 at 228].

25. Manugistics does not strictly consider sales and marketing plans, pricing, or the functionality of the TRACS program to be confidential or proprietary. [Pl. Post–Trial Mem. at 17].

26. Burdette began his employment with Manugistics on or about September 10, 1996.

*Employment Agreement*

27. Subsequent to Burdette's employment with Weseley in May, 1993, Weseley decided to implement four agreements to formalize its relationship with its employees. The agreements were a Confidentiality Agreement, an Employment Agreement containing a restrictive covenant not to compete, a Stock Option Agreement, and a Shareholder's Agreement. [Pl. 116].

28. Draft versions of the Employment Agreement were provided to employees in October or November of 1993. Burdette was given an opportunity to consult with an attorney and to suggest changes to the agreement. [Pl. ¶ 19]. Burdette consulted with a friend who is an attorney about the Employment Agreement. [Pl. 522, Pl. Post–Trial Mem. at 8–9].

29. Burdette signed the Employment Agreement on January 14, 1995. [Pl. ¶ 21].

30. Burdette was given a stock option in December, 1993 to purchase two shares in Weseley. He exercised one of those options in December, 1993 and purchased an interest in Weseley for $2,500. [Pl. ¶ 18]. Stock options were only offered to employees who agreed to stay at Weseley. *Id.*

31. If Burdette had refused to enter into the Employment Agreement with Weseley, his employment would have been terminated, he would have been required to sell his one share of stock back to the company at cost, and his second option would have expired. [Pl. ¶ 23].

32. In addition to continued employment, through Burdette's execution of the Employment Agreement, he received entitlement to severance pay if he was terminated without cause, an articulated vacation entitlement, and a policy for reimbursement of business expenses. [Pl. ¶ 24, Employment Agreement, III. Compensation and Related Matters].

33. Burdette agreed to a restrictive covenant, set forth in the Employment Agreement, § IV. A, not to

> solicit (or assist any third party in soliciting), on Employee's own behalf or on behalf of any third party, any "Business opportunity"[5] from any "Customer …"[6]

---

> be able to say why your product does something better than theirs; is that correct?
> A: You need to be able to say why your product is better.
> Q: So you need to have some understanding of competitors' products?
> A: Some understanding, yes.

**5.** The Agreement defines "Business Opportunity" to "mean and include any matter which the Company, in its own reasonable judgment, deems competitive or potentially competitive to this business or to the relationship between the

Company and the subject Customer." [Employment Agreement, IV.(4.1)(A)].

**6.** The Agreement defines "Customer" to mean and include:

> (1) any Licensee of a Company product or service; (2) any person or entity for whom the Company provided or was obligated to provide, within six (6) months prior to such Termination Date, maintenance or other services, for a fee, pursuant to formal agreement or otherwise; (3) any person or entity to whom, within six (6) months prior to such Termi-

34. Burdette agreed to a restrictive covenant, set forth in the Employment Agreement, § IV. B, not to directly or indirectly render any service, for or without any compensation, to or for Employee's own benefit or the benefit of any other person or entity, in connection with the design, development, manufacture, marketing or sale of any service-or product reasonably deemed competitive with any service or product then (or within six months prior to the Termination Date) offered by the Company; provided, however, that after termination of employment by the Company hereunder, the Employee may accept full time employment by any then Customer of the Company.

[Pl. ¶¶ 25, 26].

35. Under § IV of the Agreement, Burdette agreed to the entry of injunctive relief enjoining him from breaching the Employment Agreement. Section 4.2 states

Employee expressly acknowledges that any breach or violation of the obligations on Employee's part to be performed or observed pursuant to Section 4.1 above may not be adequately compensable solely by a money judgment. Employee accordingly expressly agrees that in addition to all provable money damages, all such obligations shall be enforceable by specific performance (including but not limited to Temporary Restraining Orders and Preliminary and Permanent Injunctions against breach or violation of such obligations) and Employee hereby waives any defense which Employee might otherwise have to the effect that any such breach or violation is adequately compensated by money damages.

[Pl. ¶ 27, Employment Agreement, V(4.2) ].

36. Burdette agreed that

Any dispute arising out of this Agreement will be resolved by arbitration in Stamford, Connecticut, by a single arbitrator under the then existing rules of American Arbitration Association provided, however, that nothing set forth in this Section 5.1 or in

any other document shall be construed to limit or reduce the rights of the Company referred to in Section 4.2 above. Judgment upon any award made by such arbitrator may be entered in any court of competent jurisdiction.

[Employment Agreement, V.(5.1) ].

37. Finally, Burdette agreed that

In the event that any provision of this Agreement is held, by a court of competent jurisdiction, to be invalid or unenforceable due to the scope, duration, subject matter or any other aspect of such provision, the court making such determination shall have power to modify or reduce the scope, duration, subject matter or other aspect of such provision to make such provision enforceable to the fullest extent permitted by law and the balance of this Agreement shall be unaffected by such invalidity or unenforceability.

*Confidentiality Agreement*

38. On November 15, 1993, Burdette entered into a Confidentiality Agreement with Weseley, agreeing, "during the term of [his] employment by [Weseley] and at all times thereafter," to

Maintain the confidentiality of all Confidential Information and take all reasonable precautions to prevent disclosure, use, duplication, reverse engineering and/or reverse compilations of any Confidential Information or any part or parts thereof for any purpose whatsoever. . . .

[Confidentiality Agreement § 3(A), Pl. ¶ 17].

The Confidentiality Agreement also states that

Upon termination of employment, and/or any other time the Company may so request, promptly deliver to the Company all contracts, memoranda, notes, records, reports and other documents (and all copies thereof) constituting or relating to any Confidential Information which the Em-

---

nation Date, the Company had made a presentation or solicitation wholly or partially in writing, or for whom the Company had performed or provided, a "savings analysis"; and

(4) any joint venturer or subcontractor of the Company.

[Employment Agreement, IV.(4.1)]

ployee may then possess or have under the Employee's control.

[Confidentiality Agreement § 3(D)].

39.  Under section 4 of the Confidentiality Agreement, the parties agreed that

In addition to all provable money damages, all obligations on the Employee's part hereunder to be performed and/or observed shall be enforceable by specific performance (including but not limited to Temporary Restraining Orders and Preliminary and Permanent Injunctions against breach or violation of such obligations) and the Employee hereby waives any defense which the Employee might otherwise have or assert to the effect that any such breach or violation by the Employee is adequately compensated by money damages.

[Confidentiality Agreement, § 4].

40.  Under the Agreement, "Confidential Information" shall mean and include but shall not be limited to all: (a) research, designs, developments, know-how, computer programs, routines and processes (including specifically but not limited to "Inventions" as defined herein) and related documentation; (b) information concerning or belonging to the Company's customers; (c) existing and contemplated projects or programs of the Company and its customers; (d) the Company's methods of operation, marketing plans and techniques, technical and strategic plans, finances, sources of supply and materials and costs, discounts and pricing practices; (e) terms of the Company's existing contracts; and (f) any information of similar or dissimilar nature that the Company designates as Confidential Information (whether or not owned or developed by the Company) and/or that is proprietary to or within the unique knowledge of the Company (whether or not discovered, originated or developed in whole or in part by the Employee) and/or that is not generally known and used in the industries and businesses in which the Company is engaged; *but specifically excluding:* (g) any such matter which is or becomes publicly known without disclosure by or fault of the Employee; (h) any such matter learned by the Employee form a third party entitled to disclose it; and (i) any such matter known to

the Employee prior to the Effective Date, as evidence by contemporaneously created written records.

[Confidentiality Agreement § 1(A)].

## II.  CONCLUSIONS OF LAW

1.  The Court has subject matter jurisdiction based on diversity of citizenship.

2.  Connecticut law applies.

3.  To obtain a preliminary injunction, Weseley must show (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions on the merits to make them a fair ground for litigation, combined with a balance of hardships tipping decidedly in its favor.

4.  Defendants moved to strike plaintiff's exhibit 36, a copy of the Employment Agreement with the signatures of both plaintiff and Burdette, contending that the Agreement is unenforceable because a representative of Weseley did not sign the Agreement until after the litigation was commenced. Defendants provided a copy of the Employment Agreement that contains only Burdette's signature, which he testified he received from his personnel file.

5.  Connecticut General Statute § 52–550 states in relevant part,

(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party to be charged: (5) upon any agreement that is not to be performed within one year from the making thereof . . .

6.  "The party to be charged" refers to "the party to be charged in the legal proceeding, not the party or parties to be bound by the contract." *Kasper v. Anderson,* 5 Conn.App. 358, 362, 498 A.2d 132 (quoting 1 Restatement 2d, Contracts § 135, cmt. a), *cert. denied,* 197 Conn. 818, 501 A.2d 388 (1985).  Here, there is no dispute that Burdette signed the agreement and he is the party to be charged in this proceeding.  Accordingly, defendants' claim fails and the Motion to Strike is DENIED.

7. The parties stipulate that Manugistics' transportation software product MTP is a competitor of Weseley's transportation software product TRACS. [Doc. # 46]. There is no dispute that Burdette was hired by Manugistics in connection with the sales of transportation management software. [Pl. Post–Trial Mem. at 5].

8. The restrictive covenant not to compete contained in the Employment Agreement was knowingly entered into by Burdette for adequate consideration. *Van Dyck Printing Co. v. DiNicola,* 43 Conn.Supp. 191, 196, 648 A.2d 898 (Conn.Super.Ct.1993) (finding restrictive covenant not to compete enforceable even though entered into after employment commenced because parties agreed to the terms prior to employment, and alternatively finding enhanced commission rate constituted new consideration), *aff'd,* 231 Conn. 272, 648 A.2d 877 (1994); *Russo Assocs., Inc. v. Cachina,* No. 27 69 10, 1995 WL 94589, *3(Conn.Super.Ct. Mar.1, 1995) (holding that where "the preexisting contract of employment is terminable at will, no overt consideration is required to support an otherwise valid covenant not to complete. The law presumes that such a covenant is supported by the employer's implied promise to continue the employee's employment; or his forbearance in not discharging the employee then and there.") (internal citations omitted) (citing *Osborne v. Locke Steel Chain Co.,* 153 Conn. 527, 531, 218 A.2d 526 (1966); *Iseli Co. v. Connecticut Light & Power Co.,* 211 Conn. 133, 136, 558 A.2d 966 (1989)).; *Daniel V. Keane Agency, Inc. v. H.A. Butterworth, Jr.,* No. 31 31 81, 1995 WL 93387 at *7, 995 Conn.Super. LEXIS 507 at *21 (Conn.Super.Ct. Feb. 22, 1995) (same).

9. Here, the Court finds consideration established by continued employment, an articulated paid vacation entitlement, a new entitlement to severance benefits and stock options. [Pl. Post–Trial Mem. at 6–7].

10. A restrictive covenant not to compete may be enforceable if the restraint is reasonable under the circumstances. *New Haven Tobacco Co.,* 18 Conn.App. at 533, 559 A.2d 715 [citing *Scott v. General Iron & Welding, Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976)], *cert. denied,* 212 Conn. 809, 564 A.2d 1071 (1989).

11. The five factors to be considered in evaluating the reasonableness of a restrictive covenant not to compete are: (1) the length of time the restriction is in effect; (2) the geographical scope of the restriction; (3) the fairness of the protection afforded the employer; (4) the extent of the restraint on the employee's ability to pursue his occupation; and (5) the extent of any interference with the public's interests. *Robert S. Weiss & Assoc., Inc. v. Wiederlight,* 208 Conn. 525, 529 n. 2, 546 A.2d 216 (1988) (citations omitted); *New Haven Tobacco Company, Inc.,* 18 Conn.App. at 533–34, 559 A.2d 715.

12. Applying this five-factor test, the Court finds the restrictive covenant is reasonable. The factors are weighed as follows: (1) the restriction lasts only one year; (2) the geographic scope of the restriction is not overly broad in light of Weseley's business throughout the United States and parts of Canada;[7] *Scott,* 171 Conn. at 138, 368 A.2d 111 ("[t]he application of a restrictive covenant will be confined to a geographic area which is reasonable in view of the particular situation."); *see Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039, 1047 (S.D.N.Y. 1987) (upholding restrictive covenant where restriction tied to geographic areas of employer's former and present customers); *Marcam Corp. v. Orchard,* 885 F.Supp. 294 (D.Mass.1995) (same); *Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1073 (S.D.N.Y.1984) (upholding unlimited geographical limitation because it was sufficiently limited as to time and given the international nature of employer's business); (3) Weseley is entitled to rely on the restrictive

---

7. It is not disputed that Weseley has customers throughout the United States. Weseley operates in at least one facility in Canada, its customers use TRACS to operate freight for Canadian facilities, and is competing for several potential Canadian customers. [Tr. 11/12/96 at 92–93] Weseley is also attempting to fill a sales position in Cana-

da. [Tr. 11/19/96 at 96]. Burdette's new job at Manugistics is primarily limited to the eastern United States and Canada. Moreover, should Burdette choose to work for a non-competitor or a customer of Weseley, he would be free to work within the United States or anywhere else.

covenant to ensure that Burdette, a Senior Logistics Analyst, will not disclose its trade secrets while working for a competitor during the time period that Weseley continues to introduce its client-server software program, TRACS 3.0 (released March, 1996), TRACS 3.1 (released in October, 1996) and TRACS 3.2 (anticipated release March, 1997); (4) other employment opportunities are available to Burdette that will enable him to work in transportation logistics for an end-user of software or third party server; and (5) there was no evidence presented to establish that enforcement of the covenant would harm the public interest. *See Weiss*, 208 Conn. at 530–31, 546 A.2d 216 (and cases cited therein); *New Haven Tobacco*, 18 Conn.App. at 533–34, 559 A.2d 715.

█ 13. Burdette's employment by Manugistics violates the plain terms of the restrictive covenant.

14. Burdette made no attempt to restrict his job search in early 1996, to exclude known competitors of Weseley, such as Manugistics. [Tr. 11/18/96 at 122–123].

█ 15. Enforcement of the restrictive covenant is necessary to prevent irreparable harm. Loss of trade secrets is not measurable in money damages and is thus considered "irreparable harm."[8] *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984) ("A trade secret once lost is, of course, lost forever"); *Computer Assoc. Int'l, Inc. v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992).

16. In this Circuit, "computer software has received judicial recognition as a trade secret." *Integrated Cash Mgt. Servs., Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375 (S.D.N.Y.1989) (citations omitted), *aff'd*, 920 F.2d 171 (2d Cir.1990); *Business Intelligence Services*, 580 F.Supp. at 1072 (S.D.N.Y. 1984) (same).

17. In *Integrated Cash Mgt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990), our Court of Appeals approved the definition of a "trade secret" from the Restatement of Torts § 757, comment b, which has been adopted by the Connecticut courts.[9] It provides:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Restatement (Fourth) of Torts* § 757 cmt. b.

█ 18. The factors used to determine whether given information is a trade secret include the extent to which the information is known outside the business and by employees and the others involved in the business, the measures taken by the employer to guard the secrecy of the information, the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Weiss*, 208 Conn. at 538, 546 A.2d 216; *Restatement (Fourth) of Torts* § 757 cmt. b.

19. Clearly, Weseley has made reasonable efforts to maintain the secrecy of TRACS source code.[10] Indeed, it is undisputed that Burdette did not have access to this.

20. Moreover, Weseley required its employees to sign confidentiality agreements and employment contracts with restrictive covenants not to compete. Customers were required to sign confidentiality and/or licensing agreements in a further effort to protect its trade secrets.

21. The evidence clearly shows that Burdette knows the identity of Weseley's customers and prospects, Weseley's prices and

---

8. The parties agreed that "any breach or violation of the obligations [of the restrictive covenant] may not be adequately compensable by a money judgment." [Employment Agreement IV § 4.2].

9. *See Robert S. Weiss & Associates, Inc. v. Wiederlight*, 208 Conn. 525, 538, 546 A.2d 216 (Conn. 1988) (citations omitted).

10. J.P. Wiggins, Vice President of Projects at Weseley Software, defines "source code" as "the actual programming language where a programmer goes in and creates the software itself." Weseley considers the source code proprietary information. [Tr. 11/13/96 at 8].

pricing methods, the features and bugs of TRACS 2.0, 3.0, and 3.1, and of 3.2 to the extent that the revisions continue to transfer the functionality of the D.O.S. versions to a Client–Server platform. He also knows details of contracts with Weseley's customers. The relevant question is whether this material is in the public domain or, if not, when it might reasonably become public or stale.

22. Defendants do not dispute that "any employee in this industry might have confidential information from prior employment." [Def. Mem. At 6]

23. "Client information, such as data on the types of hardware and software ordered by specific clients, lists of products sold to clients but not yet developed and problems arising in the course of client relations, are also protectible as a trade secret." *Business Intelligence Services, Inc.,* 580 F.Supp. at 1072. The court in *Business Intelligence Services* found a former employee's knowledge of the servicing of customer accounts, including difficulties in the software presented in the course of installation and operation and existing programs and various modules currently available, could harm the former employer and provide a competitive advantage to the competitor. *Id.*

24. On the current record, the Court finds that it is likely that Burdette will disclose confidential information either intentionally or inadvertently in his position at Manugistics. Burdette testified that he did not know how to plan to avoid using confidential information ... "[i]t hasn't been thought about." [Tr. 11/18/96 at 45].

25. The Court also heard conflicting testimony regarding Burdette's possession of certain computer disks, containing unknown information, from his former employer Nabisco, and a copy of a Wesley Software contract with one of its customers. Burdette testified that he returned the copy of the contract upon discovery that it was in his files. The Court credits Burdette's contention that the removal of this contract was inadvertent.

26. On or about August 29, 1996 [11], Burdette contacted Andy Gillespie of American

Standard, a customer of Weseley. Burdette had worked on the American Standard account while employed at Weseley but was taken off the account by his employer at the request of American Standard. [Tr. 11/18/96 at 24–29] The Court does not credit Burdette's assertion that he contacted Mr. Gillespie to continue a "personal relationship keeping him appraised of things that are going on in the industry" [*Id.* at 25], in light of the coincident timing of this contact with Burdette's resignation.

27. Burdette was responsible for performing both presales and product implementation responsibilities at Weseley. Burdette's supervisor at Manugistics, Scott Byrnes, testified that he could only identify one function, hands-on training of clients, performed at Weseley Software that Burdette would not also perform at Manugistics. [Tr. 11/19/96 57–58]

28. "When, as here, a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential information will be disclosed either intentionally or inadvertently, by the employee in the course of his new employment, enforcement of a covenant not to compete is necessary to protect against such use and disclosure." *Branson Ultrasonics Corp. v. Stratman,* 921 F.Supp. 909, 913–14 (D.Conn.1996)(RNC); *Continental Group, Inc. v. Kinsley,* 422 F.Supp. 838, 844–45 (D.Conn.1976) (enforcing 18 month covenant by enjoining employment with direct competitor).

29. "The existence of a nondisclosure agreement puts the employee on notice that the [computer] programs are considered trade secrets." *Integrated Cash Management Services,* 732 F.Supp. at 377 (multiple citations omitted).

30. On the present record, the Court finds that Burdette has not breached his confidentiality agreement by disclosing Weseley information to Manugistics.

31. Even crediting Burdette's testimony that he did not intentionally take any disks

---

11. Burdette submitted his resignation to Weseley on August 29, 1996.

or documents from Weseley and that he would never intentionally disclose confidential information, "he could not and did not leave behind his special knowledge of plaintiff's operation, and in serving his employer he will inevitably draw upon that knowledge." *Marcam Corp. v. Orchard*, 885 F.Supp. 294, 297 (D.Mass.1995) (quoting, *C.R. Bard v. Intoccia*, No. 94–11568–Z, 1994 WL 601944 (D.Mass. Oct.13, 1994)).

32. Simply put, "the harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure." *Marcam Corp.*, 885 F.Supp. at 297; *Integrated Cash Management*, 732 F.Supp. at 378 ("good intentions may not be enough to protect [a former employer]"). "It is difficult to conceive how all of the information stored in [Burdette's] memory can be set aside as he applies himself to a competitor's business and its products." *Id.* Rather, what Burdette knows about Weseley is bound to influence what he does for Manugistics and, to the extent it does, Weseley will be disadvantaged. *Id.; Business Intelligence Services, Inc.*, 580 F.Supp. at 1072 ("disclosure is likely, if not inevitable and inadvertent," if the former employee commences employment with a competitor).

33. While the covenant as a whole is reasonable, the Court is troubled by the implications of enforcing it through the vehicle of a preliminary injunction which, if entered for a full year, would deprive defendant of a trial on the merits and moot the claims in the underlying lawsuit.

34. The Court declines to determine at this time whether the one-year restriction not to compete is over broad under the circumstances presented by this case, even though the Court has authority to do so. *Robert S. Weiss*, 208 Conn. at 530, 546 A.2d 216 (reasonableness is the standard by which courts evaluate whether the time restriction in a restrictive covenant is enforceable); *see Webcraft Technologies, Inc. v. McCaw*, 674 F.Supp. 1039, 1047 (S.D.N.Y.1987) ("In ap-

propriate circumstances, courts may 'blue pencil' an over broad restrictive covenant to enforce only its reasonable provisions.") (multiple citations omitted)

35. The Court finds on the present record that it is appropriate to enjoin the defendants for a period of at least six (6) months from Burdette's termination of employment on September 16, 1996, that is, until March 16, 1997.

36. Due to the rapid changes in the software industry generally and in transportation logistics software specifically, the Court declines to enjoin the defendants for a period greater than six (6) months at this stage of the litigation.[12] In particular, it is unclear how rapidly Burdette's expertise on the TRACS 3.0, 3.1, and 3.2 versions will become part of the public domain and/or stale. Plaintiff may petition the Court in advance of March 16, 1997, to supplement the record and seek an extension of the injunction.

37. At this point, on the present record, the balance of hardships tips decidedly in favor of Weseley. If the covenant is not enforced, it is likely that Weseley will be competitively disadvantaged in marketing TRACS for which Weseley will have no adequate remedy at law. While enforcement of the restrictive covenant for six (6) months will prevent Burdette from working at Manugistics, a significant interference with his employment, Burdette has other options. Both Manugistics and Weseley agree that Burdette's experience would be valuable to a transportation software end-user. [Pl. ¶ 41, Tr. 11/13/96 at 240]. Moreover, the noncompetition agreement does not foreclose Burdette from ever working for Manugistics.

### III. CONCLUSION

For the foregoing reasons, Weseley's Motion for Preliminary Injunction [**Doc. # 8**] is **GRANTED.** Wesley Burdette is hereby enjoined from working for Manugistics in the field of transportation logistics software until March 16, 1997, unless this order be modified

---

**12.** Mitchell Weseley, President and CEO of Weseley Software, testified that the industry changes at an incredible rate. "What we do varies, changes so rapidly that the information does become stale." [Tr. 11/12/96 at 124].

or the date extended by the Court on an application timely made.

Defendants' Motion to Strike Exhibit 36 [Oral Motion filed in open court on 11/19/96] is **DENIED.**

Defendants' Motion to Strike Parol Evidence [Doc. # 42] is **GRANTED**, such that the Court has not considered any parol evidence in rendering this decision.

Counsel shall consult and propose a final discovery schedule for trial of this matter within twenty (20) days of this ruling.

Manugistics' and Burdette's Motion to Dissolve Stipulated Restraining Order [**Doc. # # 17, 18 and 33] are DENIED as MOOT** and

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir.1989)(per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir.1995).

Dated: Dec. 31, 1996.